JOURNAL-TRIBUNE PUBLISHING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 85148.    Filed August 27, 1962.

*John Enrietto, Esq.,* and *Frank C. Niswander, Esq.,* for the petitioner.

*Donald L. Sturm, Esq.,* for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax for the taxable years ended October 31, 1955, and October 31, 1957, in the respective amounts of $28,709.63 and $144,543.20.

The issue presented is whether, under the particular circumstances here involved, the petitioner is entitled to deduct as an ordinary and necessary business expense for the taxable year ended October 31, 1957, the cost of a new printing press. Involved is the question whether, under the doctrine of collateral estoppel, the parties are bound to any extent by a court decision relating to the petitioner's tax liability for a prior year. Dependent on the determination of the above issue is the amount, if any, of a net operating loss carryback to petitioner's fiscal year ended October 31, 1955.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by this reference. It was also stipulated that certain facts found by

this Court in *Journal-Tribune Publishing Co.*, 20 T.C. 654, may be taken as facts in the instant case.

The petitioner is an Iowa corporation engaged in the newspaper-publishing business, with principal office and place of business in Sioux City, Iowa. It filed its income tax returns for the taxable years ended October 31, 1955, and October 31, 1957, with the district director of internal revenue at Des Moines, Iowa. Petitioner at all times material herein kept its books and filed its returns on an accrual method of accounting.

In 1870 George D. Perkins founded a newspaper known as the Journal which was published in Sioux City, Iowa, in a morning, evening, and Sunday edition. In 1941 the Journal was published by Perkins Brothers Company. John C. Kelly founded a newspaper known as the Tribune which was published in Sioux City as an evening paper. In 1941, it was published by the Tribune Company. The two papers were the only ones published in Sioux City and had been in competition with each other since 1924. On November 26, 1941, after about 4 years of negotiating and bargaining, the two publishers effectuated an agreement. The agreement between Perkins Brothers Company and the Tribune Company provided that a new corporation to be known as Journal-Tribune Publishing Company, the petitioner herein, would be formed and that its capital stock would be subscribed to by the stockholders of Perkins Brothers Company and the Tribune Company in the proportion of 60 percent by the former and 40 percent by the latter.

Pursuant thereto the petitioner was formed on November 28, 1941, and its capital stock of $50,000 was subscribed to and paid for by the stockholders of such companies in the proportions stated. At all material times since December 1, 1941, the petitioner has published a morning daily newspaper known as the Sioux City Journal, an evening daily newspaper known as the Sioux City Journal-Tribune, and a Sunday newspaper known as the Sioux City Sunday Journal.

Pursuant to the terms of the agreement, the Tribune Company by lease dated November 28, 1941, and Perkins Brothers Company by lease dated December 1, 1941, transferred their respective newspaper establishments to the petitioner for a period of 99 years, at an annual rental of $20,000 to the Tribune Company and $30,000 to Perkins Brothers Company, payable only out of the net earnings of the petitioner from the operation of the business. The two leases contained the same provisions, except for necessary variations such as the descriptions of the properties leased, the annual rental, etc. For convenience there are quoted the provisions of only one lease, namely, that between the petitioner and the Tribune Company. Such lease provides *inter alia:*

1. * * * the lessor * * * does demise and lease unto the lessee the possession and use of the newspapers of the lessor * * * and all editions thereof heretofore published by lessor, and of which it is the owner and proprietor, including the subscriptions, good will, publishing and engraving equipment, machinery, contracts, franchises and all other property, tangible and intangible (excepting the real estate in which said property is housed), which at the time of the execution hereof has heretofore been possessed and enjoyed by the lessor in or about the publication of its said newspapers, and the conduct of its newspaper business; * * *

\* \* \* \* \* \* \*

3. As a further consideration for the leasing and demising aforesaid, the lessee further covenants, promises and agrees to bear, pay and discharge, in addition to the said rent reserved, all rents, taxes, charges for revenue and otherwise, assessments and levies, general and special, ordinary and extraordinary, of every name, nature and kind whatsoever, which may be taxed, charged or assessed, levied or imposed upon said demised property, and upon the reversionary estate therein during the term hereby granted, and so long thereafter as said lessee, its successors and assigns shall use or possess the same. * * *

4. The lessee further covenants and agrees to and with the lessor, its successors and assigns, as aforesaid, that during the term of this lease it will at all times use the demised property and the rights and privileges so demised by the lessor, in the publication of the newspaper herein referred to, and in every respect will exert its best endeavor in the upkeep and publication of said newspaper. To that end, lessee shall have the right at all times to sell or otherwise dispose of any of the physical property now or hereafter used in connection with the operation of said newspaper plant, or to remove or install the same in such quarters in the city of Sioux City, Iowa, as in its judgment may from time to time be deemed advisable or expedient, and to add thereto such new or additional machinery or equipment as from time to time it may be deemed advisable, provided, however, that any and all such additions shall be considered and treated as demised jointly under this lease and a lease being contemporaneously executed by the lessee and the Perkins Bros. Company in the proportion of forty per cent under this lease and sixty per cent under the lease between the lessee and the Perkins Bros. Company and all and every of the obligations on the part of the lessor herein provided shall be deemed to extend to all the physical property hereafter acquired by the lessee, and used by it in the operation of its said business.

\* \* \* \* \* \* \*

8. It is further covenanted and agreed by and between the parties hereto that in the event of the termination of this lease at any time before the expiration of said demised term of ninety-nine years, for the breach of any of the covenants herein contained, then and in such case all the property demised hereby, and a forty per cent interest in all choses in action, rights, privileges and franchises whatsoever, which may up to said time have been acquired by said lessee in or about the operation of its said business, shall be forfeited to the said lessor, its successors and assigns, as aforesaid, and shall become its or their property, and no compensation therefor shall be allowed or paid to the lessee.

9. At the termination of the term of this lease the lessee shall have the option to purchase the right, title and interest of the lessor and its assigns, as hereinbefore provided in and to the leased property, provided it shall notify it or them in writing of its said election at least one year before the end of

the term, and by paying therefor the fair market price at that time, to be determined through appraisal by three disinterested persons; one to be appointed by the lessor; or a majority in interest of its assigns; one to be appointed by the lessee; and one to be appointed by the two appraisers so selected. In the event the lessee shall not elect so to purchase and pay the purchase price so fixed and determined as aforesaid, the said demised property with forty per cent of all the rights, privileges and franchises then possessed, used or enjoyed by the said lessee and more particularly hereinbefore described, shall revert to the said assigns of the lessor, and shall be delivered to and held by them in the the proportions to which each shall be entitled.

There have been no changes in the lease agreements between the petitioner and the Tribune Company and Perkins Brothers Company subsequent to October 31, 1948.

As contemplated by the leases, the petitioner early in 1942 issued rental certificates with a face value of $30,000 to Perkins Brothers Company and $20,000 to the Tribune Company. These rental certificates were to be assignable and represented a proportionate interest in the rentals and in the reversionary interest in the property covered by the leases. The Tribune Company went into voluntary liquidation and its rental certificates were distributed pro rata among its individual stockholders.

The combined physical assets of the two newspapers at the date of leasing had a value of $353,000, and the circulation structure, goodwill, franchises, and other intangibles had a value of from $10 to $15 per paid daily subscriber. On March 21, 1942, the total daily circulation was 84,712 and the Sunday circulation was 56,505. The value of the circulation structure and of other intangibles therefore was between $847,120 and $1,370,680, giving an aggregate value for the leased properties ranging from $1,200,120 to $1,723,680.

Included among the items of machinery and equipment which the petitioner took over under the lease from the Tribune Company were two printing presses, with auxiliary and driving machinery, known respectively as a 3½-unit R. Hoe & Co. press and a 2½-unit R. Hoe & Co. press (also known as a right-angle "Quad"), which had theretofore been used by the Tribune Company in printing its daily and bulldog editions of the evening newspaper leased to petitioner. These presses were operated until the printing of newspapers by the petitioner could be consolidated in the Journal Building. The Tribune presses remained inoperative thereafter in their location in the Tribune Building until their sale by petitioner on September 30, 1945, for the sum of $14,500.

Both of the Tribune presses were equipped to print black and one color. The 3½-unit Hoe press had a normal capacity to print 24 pages at a speed of 28,000 to 30,000 copies per hour on a "straight run." The 2½-unit Hoe press had a normal capacity to print 24

pages in black only and 16 pages in black and one color at a speed of 15,000 to 18,000 copies per hour on a "straight run." In the case of each press on a "collect run," the number of pages would be doubled but the number of copies of each page would be halved.

Included among the items of machinery and equipment taken over by the petitioner under the lease from Perkins Brothers Company were two printing presses, with auxiliary and driving machinery, known respectively as a 4-unit Walter Scott & Co. press and a 4-unit R. Hoe & Co. press. These two presses had theretofore been used by Perkins Brothers Company in printing the daily and Sunday editions of its newspapers which were leased to petitioner and were located in the basement of the Journal Building.

The 4-unit Walter Scott & Co. press was equipped to print in black and one color. It had a normal capacity to print 32 pages in black only and 24 pages in black and one color at a speed of 25,000 to 28,000 copies per hour on a "straight run."

The 4-unit R. Hoe & Co. press was equipped to print in black and three colors and had a normal capacity to print 32 pages in black and one color or 24 pages in black and three colors, at a speed of 15,000 to 18,000 copies per hour on a "straight run." However, this press was basically only a magazine press and was used only to print color comics, so that it was unsatisfactory for printing color advertising. Both this press and the 4-unit Scott press would print twice as many pages on a "collect run," but the number of copies would be halved.

The petitioner continued to use the two above-described presses until 1949. In that year it acquired from Walter Scott & Company "where and as is" a used 1926 Scott 6-unit printing press with two folders and auxiliary machinery, including two motor drives, theretofore used and situated in the plant of the New York Herald-Tribune in New York City. This press was equipped to print black and white and one spot color, and had a capacity to print 36,000 copies per hour at maximum speed on a "straight run" and 18,000 copies per hour on a "collect run." The color capacity was set up for four pages on a "straight run" and eight pages on a "collect run."

The petitioner's decision to purchase a used printing press was prompted by the 3-year waiting period for new presses which existed at that time. In fact, only a limited number of used presses were then available, most of which had been built prior to 1926.

The 6-unit Scott press was installed and put in full operation about September 18, 1949, in place of the 4-unit Hoe press which had been dismantled and removed during the summer of 1949. The total amounts expended by the petitioner in respect of the 6-unit Scott press, auxiliary equipment, transportation, and installation were $136,491.07 and $10,768.28 in its fiscal years 1949 and 1950, respectively.

The petitioner disposed of the 4-unit Hoe press in October 1949, for $7,994.50. Shortly thereafter the 4-unit Scott press was dismantled and held for sale. It was thereafter sold in two sections—one in 1952 for $9,230 and one in 1956 for $3,000.

From about September 18, 1949, until January 6, 1958, the petitioner operated only the 6-unit Scott press in printing all editions of its newspaper.

At the time that the petitioner purchased the 6-unit Scott press it was represented that the press was in excellent condition, and the petitioner purchased it without examining it or conducting any test runs on it. However, the quality of production and the efficiency of this press were not wholly satisfactory to the petitioner from the time of its purchase. Petitioner made repairs to the press, but was unable to cease operations long enough to recondition or rebuild it. Petitioner operated the Scott press at a maximum speed of 28,000 copies per hour, and at that speed for only limited periods of time because of the rattles the press produced. The gears on the press did not function properly because they were worn thin, and the footboards and the slots for the plate lockups were also badly worn. The petitioner was never able to synchronize the two motors. As a consequence, all of the unit drives and the folder drives were pulled by one motor at a time, rather than by two motors. The production waste on the 1926 Scott press amounted to a little over 3 percent, whereas normal production waste was about 2 percent. The number of reruns, and the amount of oil used, were excessive.

Since prior to 1941 Walter Scott & Co. had manufactured printing presses with multicolor facilities, but there was little demand therefor prior to World War II. The demand for coloring in the newspaper industry increased in the Midwest after World War II and during the 1950's, largely because of the demands of advertisers. The petitioner's board of directors at a meeting held in February 1954 discussed various aspects of the business in the future, such as color advertising. At a meeting held in February 1955 they further discussed color printing, and the possible future need of investing in a color press. In February 1955 petitioner's mechanical superintendent wrote to R. Hoe & Company for information regarding a new press, stating that petitioner was interested in one with reversible cylinders and color couples. In August 1955 he wrote to R. Hoe & Company and to the Goss Printing Press Company to determine whether those companies could add color cylinders to the 6-unit Scott press. Each company replied, in effect, that the engineering and manufacturing costs of building such cylinders for the Scott press would be prohibitive. Walter Scott and Company could have added a color unit to the 1926 Scott press, but, since the press was a camelback type unit, the cost would

have been prohibitive. Thus, as a practical matter, petitioner had to purchase a new press in order to obtain multicolor printing for its newspapers.

In the spring of 1956, the petitioner obtained proposals for the construction and installation of a new printing press and auxiliary equipment from the Goss Printing Press Company and from R. Hoe & Company, Inc. At a special meeting held on June 27, 1956, the board of directors of the petitioner discussed the advisability of ordering a new press at that time and compared the two proposals which had been submitted. The directors agreed that, because of the rapid development of color work in newspapers, it seemed necessary to invest in a new press which printed multicolors in order to retain its competitive position.[1] They accordingly authorized petitioner's president to negotiate with the Goss Company for the purpose of securing new press units.

On July 13, 1956, the petitioner entered into a contract for the purchase and installation of a 5-unit Goss Headliner press, with a half-deck for the printing of color, for $360,250, f.o.b. factory. The cost of the half-unit color deck for the press was approximately $40,000. On the same date, the petitioner entered into two additional contracts with the Goss Company for the purchase and installation of unit drive equipment and conveyor equipment for $41,000 and $9,070, respectively.

In order to provide additional storage space for newsprint and to utilize the 6-unit Scott press at full capacity during the installation of the new Goss press, it was decided that petitioner would house the new press in a building to be constructed by Perkins Brothers Company on the land adjoining petitioner's plant, which land was acquired by Perkins Brothers after the petitioner executed the contracts with Goss. The new building did not result in a change in the specifications of the new Goss press. While the new press was in the process of being manufactured, the Goss Company, at the request of petitioner, altered the press to provide for a nine-column page. This alteration did not increase the price of the press. Installation of the press was commenced on October 1, 1957, and was completed on January 5, 1958. The petitioner made its last press run of newspapers on the 6-unit Scott press on January 5, 1958. Commercial runs for all editions of the newspaper on the new Goss press started on January 6, 1958.

---

[1] In 1956, there were three newspapers in the petitioner's trade area with multicolor facilities, none of which equaled petitioner's total daily or Sunday circulation. There were eight other daily newspapers published in petitioner's trade territory without color facilities at that time; the circulation of each of these eight papers varied between 5,000 and 28,000.

The 5½-unit Goss press is a "straight line" unit,[2] having a normal operating life in excess of 1 year. It has automatic pushbutton controls for the printing of colors. In general, the Goss press produced a better quality of printing than the 6-unit Scott press. The number of men required to operate the press was not less than the number required to operate the old press. The maximum printing speed of the 5½-unit Goss press is 60,000 copies per hour and the normal speed is 50,000 copies per hour. It can print 80 pages on a straight run and 40 pages on a collect run. Speed is not an important factor in the publication of petitioner's newspapers,[3] and the increased speed of the new press did not shorten petitioner's deadline to any significant extent. The petitioner normally operated the Goss press to print 32,000 copies per hour.

Pursuant to the terms of the contracts, the petitioner, on July 13, 1956, made a downpayment of $41,032, representing 10 percent of the cost of the press, the drive equipment, and the conveyor equipment. During its taxable year ended October 31, 1957, it made payments totaling $310,423.45 in accordance with the terms of the contracts. This brought the payments to $351,455.45, representing 85 percent of the total contract prices. The remainder of the cost, $62,021.55, was paid on April 11, 1958, the date due under the contracts.[4]

Prior to the installation of the new Goss press the petitioner made efforts to sell the 6-unit Scott press, by running advertisements in a trade magazine in April and May 1957. Additional efforts to sell the Scott press were made by further advertisements and by letters written to various publishers, dealers in used newspaper machinery, and consuls in certain Latin American countries. The asking price of the Scott press was generally quoted as $50,000 "as is, where is," less a 10-percent dealer's commission, but petitioner would have accepted a lesser amount. A purchaser of the press would have had to pay $50,000 or more in addition to the purchase price in order to dismantle, move, and install the press.

In its attempt to sell the old Scott press, the petitioner represented it to be in good, satisfactory, or excellent condition, and in a series of letters to the consuls in Latin America it was stated that the purpose in replacing the Soctt press was to secure a faster press to accommodate petitioner's large circulation. These statements regarding the condition of the Scott press and the purpose for replacing it represented sales devices to induce a prospective purchaser to examine the press.

---

[2] The 6-unit Scott press was a "multiunit" press. The essential difference between a "straight-line unit" press and a "multiunit" press is the arrangement of the units with respect to the folders. The straight-line unit press is better for multicolor printing.

[3] The petitioner's total daily circulation in its retail trading zone decreased from 80,834 in 1950 to 76,375 in 1957, and to 72,177 in 1960; its total Sunday circulation dropped from 63,948 in 1950 to 58,360 in 1957, and 53,457 in 1960.

[4] The total amount paid, $413,477, included an amount of $3,157 representing the cost of a paper roll hoist ordered after the execution of the contract and the increased cost of the conveyor equipment caused by the change in the location of the press.

During the time the petitioner was attempting to sell the Scott press to a user, either in toto or by units, it sold extra parts which had never been used, but refused to sell parts from the press itself. Three or four prospective purchasers investigated the press seriously after the installation of the new press, but only one of them asked for a demonstration of the press in operation and no one made an offer to the petitioner for it. After trying unsuccessfully for about 2 years to sell the press in toto or by units, the petitioner finally sold parts from it. On April 18, 1961, the petitioner sold the remainder of the Scott press to a local junk dealer for $2,500 "where is, as is."

After the new Goss press went into operation, the old Scott press was never operated by petitioner, except to demonstrate it to a prospective purchaser. It was never webbed in the sense of having paper inserted for printing after such time. All the paper for the Scott press was sold in January 1958. The press was never held or used by petitioner as standby equipment.

Of the petitioner's total advertising lineage, the portion represented by color lineage rose from 3.19 percent in the calendar year 1957 to 4.36 percent in the calendar year 1958. Of the total color lineage in 1958 and subsequent calendar years, approximately 10 percent represented multicolor printing and approximately 90 percent represented spot color. Prior to 1958 all color lineage was spot color.

When the petitioner purchased the 6-unit Scott press in 1949 it incurred costs with respect thereto in both of its fiscal years ended October 31, 1949, and October 31, 1950. Such costs were entered in an account entitled "New Press Account," and at the end of each of those fiscal years this account was closed to the maintenance of leased plant account, together with items from the machinery and equipment and furniture and fixtures accounts. Balances in the maintenance of leased plant account of $172,896.38 and $18,757.98 for the fiscal years ended October 31, 1949, and October 31, 1950, respectively, after crediting the proceeds from items of leased equipment sold during the fiscal years, were closed to petitioner's profit and loss account.[5]

[5] Such amounts were claimed as ordinary and necessary business expenses in its income tax returns for those fiscal years. The respondent's determination with respect to the deductibility of such amounts was delayed pending the outcome of litigation before this Court involving the taxpayer's liability for the taxable year ended October 31, 1948, hereinafter referred to. Later, by letter of April 22, 1955, the respondent, pursuant to the opinion of the Court of Appeals for the Eighth Circuit in the mentioned litigation, hereinafter referred to, approved petitioner's deduction of expenditures made in respect of the purchase of the Scott press, and other deductions for maintenance of leased plant taken in its returns for the taxable years ended October 31, 1949, 1950, and 1951.

During the fiscal years ended October 31, 1952, 1953, 1954, 1955, and 1956, the petitioner made expenditures for various items of machinery, equipment, and furniture and fixtures, and also made sales of leased equipment. These items were reflected in the balance of the maintenance of leased plant account at the end of each of such fiscal years. Such balances were deducted by the petitioner in its income tax returns for those years and such deductions were allowed by the respondent, with the exception of certain items.

Petitioner charged to the maintenance of leased plant account on October 31, 1957, that portion of the purchase price of the new 5½-unit Goss press which had accrued and been paid up to that time, namely, $351,455.45.[6] Petitioner closed the balance of this account for such fiscal year, $393,734.28, to its profit and loss account and deducted it as an expense in its income tax return for the taxable year ended October 31, 1957. Petitioner's return for such taxable year reflected a net loss of $62,910.83.

The petitioner computed a net operating loss of $55,210.83 for the taxable year ended October 31, 1957, and based thereon filed, on January 6, 1958, an application for a tentative carryback adjustment to its taxable year ended October 31, 1955, claiming a refund of $28,709.63 for such prior taxable year. The respondent on February 5, 1958, refunded the amount of $28,709.63, plus interest of $357.89.

In the notice of deficiency the respondent disallowed the deduction of $351,455.45 claimed as maintenance of leased plant for the taxable year ended October 31, 1957, stating that "such amount represents an improvement of a permanent nature and is considered a capital expenditure." In such notice, the respondent disallowed the amount previously allowed as a tentative carryback adjustment to the taxable year ended October 31, 1955, and determined a deficiency of $28,709.63 for that year.

When the petitioner in 1956 placed the order for the new 5½-unit Goss press the old 6-unit Scott press was wasteful and inefficient, and did not furnish the quality of production which the petitioner required to compete with other newspapers in the area. The petitioner's purpose in acquiring the new Goss press was to replace the old Scott press and also to acquire the additional facility of multicolor printing.

The 5½-unit Goss press purchased by the petitioner represented a replacement of the 6-unit Scott press, except for the half-deck for the printing of multicolor advertising, which represented an addition to the leased property.

*Prior Litigation With Respect to Petitioner's Taxable Year Ended October 31, 1948.*

In its income tax return for the taxable year ended October 31, 1948, the petitioner deducted the amount of $12,284.94 as maintenance of leased plant. The respondent disallowed the claimed deduction and the petitioner filed a petition with this Court. The case was decided by this Court on June 24, 1953. *Journal-Tribune Publishing Co.*, 20 T.C. 654. The facts there found disclose that the case involved the same leases as are involved in the instant case, unchanged in the

---

[6] Of this amount, $310,423.45 had been paid in the fiscal year ended October 31, 1957, and the balance of $41,032 in the prior fiscal year.

interim. At the beginning of its taxable year ended October 31, 1948, the petitioner had a balance in its account reserve for machinery and equipment replacement of $2,258.05. During the year it sold an item of equipment for $1,400. During that year it purchased 23 items of machinery, equipment, furniture, and fixtures, each having a useful life in excess of 1 year, the total cost of which was $15,897.80, which exceeded the sale proceeds then available in the replacement account by $12,284.94. Twenty-two of these items, costing $13,873.05, replaced similar items held under the leases. One of the items purchased was a motion-picture camera and related equipment costing $2,024.75, which did not replace any similar property leased to the petitioner.

We there held that none of the amounts expended was deductible as an ordinary and necessary business expense. We took the view that the assets acquired, all of which had useful lives in excess of 1 year, were capital assets, the cost of which was recoverable only by way of depreciation over their useful lives or the remaining term of the leases, whichever was the lesser. We further stated that, having so held, it was unnecessary to determine whether or not the leases imposed an obligation upon the petitioner to make the expenditures sought to be expensed.

Upon appeal our decision was affirmed in part and reversed in part by the Court of Appeals for the Eighth Circuit. *Journal-Tribune Publishing Co.* v. *Commissioner*, 216 F. 2d 138. The Court of Appeals held that under the leases the petitioner was not only obligated to pay certain rentals, but in addition was obligated to make expenditures in the maintenance of the property. It further held that all the expenditures there involved, except those for the motion-picture camera and related equipment, were for items of machinery, equipment, and furniture and fixtures to replace items of similar machinery and equipment that were discarded because of wear and tear and for the purpose of maintaining the upkeep of the plant and equipment at a standard established and maintained at the time it took over the properties from its lessors, and that these expenditures were deductible as ordinary and necessary business expenses. It held that the motion-picture camera and related equipment did not replace any property which petitioner had received from its lessors, but was in addition thereto; that such property was in the nature of a betterment; and that the cost thereof was not deductible as an ordinary business expense of maintenance.

### OPINION.

The first question for consideration is whether the parties are bound to any extent, under the doctrine of collateral estoppel, by the decision

of the Court of Appeals for the Eighth Circuit in *Journal-Tribune Publishing Co.* v. *Commissioner*, 216 F. 2d 138, with respect to the issue of deductibility, under section 162(a) of the Internal Revenue Code of 1954, of the amounts paid for the new printing press and related equipment.

The respondent contends that the issue of collateral estoppel is not before us, claiming that it was not properly pleaded by the petitioner. In this we think he is in error. The allegations of error and fact in the petition specifically raise the issue of the failure of the respondent to give effect to the decision of the Court of Appeals in the prior case. At the hearing counsel for the petitioner made it clear that the purpose was to raise the issue of collateral estoppel and in support thereof he introduced the record of the former case made in this Court and in the Court of Appeals. Counsel for the respondent did not object to such introduction on the ground that the issue of collateral estoppel was not properly raised, but, rather, upon the ground that the issues in the instant proceeding are different from those involved in the prior proceeding.

The doctrine of collateral estoppel is fully discussed in *Commissioner* v. *Sunnen*, 333 U.S. 591, and we quote at some length from the Supreme Court's opinion.[7] See also *Tait* v. *Western Md. Ry. Co.*, 289 U. S. 620, and *Fairmont Aluminum Co.*, 22 T.C. 1377, affd. (C.A. 4) 222 F. 2d 622, certiorari denied 350 U.S. 838. It is to be noted from the Supreme Court's opinion that the doctrine of collateral estoppel is to be narrowly applied; it is confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first suit; and the legal matter raised in the second proceeding

---

[7] * * * The general rule of *res judicata* applies to repetitious suits involving the same cause of action. * * * The rule provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." * * *

But where the second action between the same parties is upon a different cause or demand the principle of *res judicata* is applied much more narrowly. In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but "only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." * * * Once a party has fought out a matter in litigation with the other party, he cannot later renew that duel. In this sense, *res judicata* is usually and more accurately referred to as estoppel by judgment, or collateral estoppel. * * *

These same concepts are applicable in the federal income tax field. Income taxes are levied on an annual basis. Each year is the origin of a new liability and of a separate cause of action. Thus if a claim of liability or non-liability relating to a particular tax year is litigated, a judgment on the merits is *res judicata* as to any subsequent proceeding involving the same claim and the same tax year. But if the later proceeding is concerned with a similar or unlike claim relating to a different tax year, the prior judgment acts as a collateral estoppel only as to those matters in the second proceeding which were actually presented and determined in the first suit. Collateral estoppel operates, in other words, to relieve the government and the taxpayer of "redundant litigation of the identical question of the statute's application to the taxpayer's status." *Tait* v. *Western Md. R. Co.*, 289 U.S. 620.

must involve the same set of events or documents and no others. The Supreme Court specifically pointed out that if the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case, and a court is free in the second proceeding to make an independent examination of the legal matters at issue. See *Maud H. Bush*, 10 T.C. 1110, affd. (C.A. 2) 175 F. 2d 391, in which we pointed out that the *Sunnen* case drastically limited the scope of the doctrine of collateral estoppel as applied in the field of tax litigation; that for collateral estoppel to apply the matter raised in the second proceeding must be identical in *all* respects with that decided in the first proceeding; and that the second case must present the very same facts and no others.

The issue in the prior case decided by the Court of Appeals was whether the petitioner was entitled to deduct as an ordinary and necessary business expense for the taxable year ended October 31, 1948, the cost of various items of machinery, equipment, and furniture and fixtures. The issue in the instant case is whether the petitioner is entitled to deduct as an ordinary and necessary business expense for the taxable year ended October 31, 1957, amounts paid upon the purchase price of a new printing press and related equip-

---

* * * A taxpayer may secure a judicial determination of a particular tax matter, a matter which may recur without substantial variation for some years thereafter. But a subsequent modification of the significant facts or a change or development in the controlling legal principles may make that determination obsolete or erroneous, at least for future purposes. * * * That principle [collateral estoppel] is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally. * * *

And so where two cases involve income taxes in different taxable years, collateral estoppel must be used with its limitations carefully in mind so as to avoid injustice. It must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged. *Tait* v. *Western Md. R. Co., supra.* If the legal matters determined in the earlier case differ from those raised in the second case, collateral estoppel has no bearing on the situation. See *Travelers Ins. Co.* v. *Commissioner,* 2 Cir., 161 F. 2d 93. * * *

*       *       *       *       *       *       *

Of course, where a question of fact essential to the judgment is actually litigated and determined in the first tax proceeding, the parties are bound by that determination in a subsequent proceeding even though the cause of action is different. See *Evergreens* v. *Nunan,* 2 Cir., 141 F. 2d 927. And if the very same facts and no others are involved in the second case, a case relating to a different tax year, the prior judgment will be conclusive as to the same legal issues which appear, assuming no intervening doctrinal change. But if the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case. Thus the second proceeding may involve an instrument or transaction identical with, but in a form separable from, the one dealt with in the first proceeding. In that situation, a court is free in the second proceeding to make an independent examination of the legal matters at issue. It may then reach a different result or, if consistency in decision is considered just and desirable, reliance may be placed upon the ordinary rule of *stare decisis.* Before a party can invoke the collateral estoppel doctrine in these circumstances, the legal matter raised in the second proceeding must involve the same set of events or documents and the same bundle of legal principles that contributed to the rendering of the first judgment. * * *"

ment. This issue, of course, was not decided in the prior case. The actual facts with respect to the item here involved were not even in existence at the time of the decision in the prior case. Certainly, then, it cannot be said that the instant case involves the very same facts as were involved in the prior case, and no others. Accordingly, it cannot be concluded that the matter here raised is identical in all respects with that decided in the prior case. The petitioner would have us consider that the relevant and controlling facts in the two cases are identical in that there are involved the same parties and the same underlying leases. We cannot agree with this view. As stated, the items here involved are entirely separable from the items involved in the prior case, and the decision in the instant case necessitates the consideration of facts which did not enter into the decision in the prior case. Accordingly, we must conclude that the decision of the Court of Appeals in the prior case is not conclusive, under the doctrine of collateral estoppel, upon the parties with respect to the issue here presented. We are free to, and must, make an independent examination of the legal matters here at issue, and in connection therewith give consideration to the various contentions made by the parties and to the effect of the prior opinion of the Court of Appeals under the ordinary rule of stare decisis.

The Court of Appeals in the prior case held that amounts totaling $13,873.05 expended by the petitioner in its fiscal year ended October 31, 1948, for 22 items of machinery, equipment, furniture, and fixtures acquired to replace existing property held under the leases which was discarded because of wear and tear, constituted maintenance expenses which it was required to incur under the terms of the leases and that such expenditures, to the extent not paid out of proceeds from sales of leased property, were deductible as ordinary and necessary business expenses. However, the court held, affirming this Court to that extent, that the motion-picture camera and related equipment, which did not replace any similar property held under the leases, constituted additional property in the nature of a betterment, the cost of which was not deductible as an ordinary and necessary business expense.

The petitioner contends that the amounts here expended for the new Goss press and related equipment are of the same character as the expenditures which the Court of Appeals held to be deductible in the prior case, and that hence they are deductible as ordinary and necessary business expenses. Its position is that the new press did not represent an addition or betterment to the leased property, but that it was a replacement thereof made necessary by the inadequacy of the old press and that it was acquired pursuant to the obligation of the leases to maintain the standard of upkeep of the leased property.

The respondent, on the other hand, contends that the new press and related equipment represents the cost of a permanent improvement or betterment made to increase the value of the leased property and that the cost thereof may not be deducted in view of the provisions of section 263(a) of the 1954 Code, which, under the heading of "Capital Expenditures" provides in part:

GENERAL RULE.—No deduction shall be allowed for—

(1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * *

*       *       *       *       *       *       *

(2) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made.

Among other things, the respondent contends that it was not necessary, in order to maintain the leased property at the required standard of upkeep, to purchase the new press since the old Scott press was performing adequately in all respects except that it could not print multicolor advertising. He claims that the reasons for purchasing the new press were to obtain facilities for multicolor printing, which the old press did not have, and to obtain faster speed and latest design and structural changes. He therefore urges that the new press did not represent a replacement of the old press, but that it was an addition to the leased property as were the motion-picture camera and related equipment in the prior case.

We think it clear that, in the main, the new Goss press represented a replacement of property held by the petitioner pursuant to the leases, namely, the old Scott press, and not property in addition to the leased property,[8] but as will be pointed out later, we think this is not dispositive of the issue presented. As shown in some detail in the Findings of Fact, the Scott press, when purchased in 1949, was an old 1926 model, was in poor shape, and continued to be inefficient and wasteful. The petitioner's vice president testified that it did not furnish the quality of production required by petitioner in its competitive business, and in effect stated that in making the decision to acquire the new press, while multicolor printing was a factor because of the fact that some of its competitors were able to print multicolor advertising, it was not the major factor.[9] While the new Goss press

[8] One of the respondent's contentions is that the new press should not be considered as a replacement of the old, since, he contends, it was the petitioner's intention to retain the old press in a standby position. At the hearing there was considerable controversy, and contradiction in the testimony, as to whether the company representatives had so advised the revenue agent. We are satisfied, however, from the record as a whole, that the petitioner did not intend to retain the old press. The evidence shows that efforts were made to sell the old press prior to the installation of the new Goss press, and that it was ultimately disposed of. It never was used in the petitioner's business after the Goss press went into operation.

[9] This testimony is corroborated by the fact that after commencing operation of the new press, multicolor printing constituted only about 10 percent of petitioner's total color lineage, while spot color, which it had had since 1942, constituted 90 percent thereof.

had a maximum speed greatly in excess of that of the old Scott press, the petitioner's vice president testified that speed was not a factor in the publication of petitioner's newspapers. In this connection it may be observed that the circulation of petitioner's newspapers was declining from 1950 on. Actually, the petitioner operated the new Goss press at only slightly greater speed than it had operated the Scott press. Obviously a new machine embodies the latest design and structural changes resulting from advances in the manufacturing art, but this does not in itself affect the question of whether the new machine is a replacement of the old. We are satisfied that the new press represented a replacement, except to the extent of the color half-deck. And with respect to the latter, we are satisfied that it represented an addition to the leased property, since neither the original presses nor the Scott press were equipped to print multicolor advertising, despite the fact that there had been available since prior to 1941 presses equipped for that purpose.

We think it clear that that portion of the amount in question which represented the cost of the color half-deck is similar to the cost of the motion-picture camera and related equipment which was involved in the prior case and which we and the Court of Appeals held to be a nondeductible capital expenditure. It is also our conclusion that the remainder of the cost also represents a nondeductible capital expenditure. As indicated above, we think that the fact that such expenditure was for a *replacement* is not dispositive of the issue. Nor is the result affected if we assume *arguendo* that the expenditure comes within the provision of the leases requiring the petitioner to exert its best endeavor in the upkeep and publication of the newspapers.

The case of *Duffy* v. *Central R.R.*, 268 U.S. 55, stands for the proposition that if an expenditure is in its nature a capital outlay, and would be so considered if it had been made by the lessor, the fact that the expenditure was required of the lessee by the terms of the lease does not change its character and render it a deductible expense of maintenance or rental. In that case the taxpayer was the lessee, for a term of 999 years, of certain railroads. The railroad leases required the taxpayer to maintain and keep the leased property in good order and repair and fit for efficient use. A reference to the opinion of the Circuit Court of Appeals for the Third Circuit in that case (289 F. 2d 354) discloses that the taxpayer expended amounts under such railroad leases for renewing bridges, a station, and retaining wall, for installing a telephone system, and for such work and materials as were required for repairing, renewing, improving, and increasing weight of rails, yard tracks, water supply facilities, and equipment and facilities, and that all these expenditures were admittedly for additions and betterments necessary to meet the main-

tenance requirements of the leases. In holding that these expenditures were not deductible as ordinary and necessary business expenses, the Supreme Court stated in part:

Clearly the expenditures were not "expenses paid within the year in the maintenance and operation of its [respondent's] business and properties"; but were for additions and betterments of a permanent character, such as would, if made by an owner, come within the proviso in subdivision Second, "that no deduction shall be allowed for any amount paid out for new buildings, permanent improvements, or betterments made to increase the value of any property," etc. They were made, not to keep the properties going, but to create additions to them. They constituted, not *upkeep*, but *investment;* not maintenance or operating expenses, deductible under subdivision First, § 12(a), but capital, subject to annual allowances for exhaustion or depreciation under subdivision Second.

Nevertheless, do such expenditures come within the words "rentals or other payments required to be made as a condition to the continued use or possession of property"? We think not. * * * The term "rentals," since there is nothing to indicate the contrary, must be taken in its usual and ordinary sense, that is, as implying a fixed sum, or property amounting to a fixed sum, to be paid at stated times for the use of property. *Dodge* v. *Hogan*, 19 R.I. 4, 11, 31 A. 268, 1059; 2 Washburn, Real Property (6th Ed.) § 1187; and in that sense it does not include payments, uncertain both as to amount and time, made for the cost of improvements or even for taxes. * * * Expenditures, therefore, like those here involved, made for betterments and additions to leased premises, cannot be deducted under the term "rentals," in the absence of circumstances fairly importing an exceptional meaning; and these we do not find in respect of the statute under review. Nor do such expenditures come within the phrase "or other payments," which was evidently meant to bring in payments ejusdem generis with "rentals," such as taxes, insurance, interest on mortgages, and the like, constituting liabilities of the lessor on account of the leased premises which the lessee has covenanted to pay.

In respect of the 999-year leases, the additions and betterments will all be consumed in their use by the lessee within a fraction of the term, and, as to them, allowances for annual depreciation will suffice to meet the requirements of the statute. * * *

The view that the character, for tax purposes, of an expenditure made by a lessee is not affected by the fact that it is required by the terms of the lease was enunciated as early as the case of *National City Bank of Seattle*, 1 B.T.A. 139, and in our opinion it represents the proper view. It was there stated:

It is important to consider whether a lessee may deduct from gross income in accordance with section 234(a)(1) of the taxing act every payment which it may be required to make under the covenants of the lease, or whether it is limited in making deductions under this paragraph to annual payments in the nature of expenses. There are clearly certain payments of this nature which it is privileged to deduct, such, for instance, as taxes paid upon the lessor's property; payments for repairs made to the property; interest paid upon the bonds and dividends paid upon the stock of the lessor corporation. Payments made by a lessee for improvements upon the lessor's premises are not an annual charge. They are not "ordinary and necessary expenses" of the lessee in the transaction of business for the year in which the payments are made, provided,

of course, the term of the lease extends beyond the end of the taxable year. From the standpoint of the lessee they represent an investment of capital for improvements which will inure to the benefit of the lessee for the term of the lease, or for the term of the useful life of the improvements.

Basically a capital expenditure is one which results in the acquisition of some property or benefit the useful life of which extends beyond the current year—that is, which contributes to the production of income over a period beyond the current year. In *Hotel Kingkade* v. *Commissioner*, (C.A. 10) 180 F. 2d 310, affirming *Hotel Kingkade*, 12 T.C. 561, it is stated:

Generally, an expenditure should be treated as of a capital nature if it brings about the acquisition of an asset having a period of useful life in excess of one year or if it secures a like advantage to the taxpayer which has a life of more than one year. * * *

See also *Denver & Rio Grande Western Railroad Co.* v. *Commissioner*, (C.A. 10) 279 F. 2d 368, affirming 32 T.C. 43, in which it was held that expenditures made by a railroad which resulted in a substantial restoration, strengthening, and improvement of a viaduct constituted nondeductible capital expenditures. See also the Income Tax Regulations under section 263 of the Code.[10]

We think it clear that the acquisition of the new Goss press increased the value of the leased property. The cost of the new press and related equipment was $413,477 (of which $351,455.45 was paid prior to the end of the taxable year in question), whereas the old press was offered for sale by the petitioner "as is, where is" at $50,000 and actually was sold for much less than that amount as junk. Nor can there be any question that the new Goss press prolonged the life of the leased property. There is no evidence as to the length of the useful life of the new Goss press, except for the stipulation that it had a useful life in excess of 1 year, but it is obvious that it had a useful life of many years. Without attempting to fix the length of useful life of the new press, it may be pointed out that the old Scott press had been in operation for about 30 years. Furthermore, as the petitioner points out in its brief, the respondent's official publication Bulletin "F" states that the average useful life of a printing press is 25 years.

It is clear, therefore, that the amount expended for the new press resulted in the acquisition by the petitioner of an asset, the use or benefit of which would extend over a number of years. The expenditure did not have to do merely with the earning of income of the current year, but would contribute toward the production of income

[10] Section 1.263(a)–1 of the Income Tax Regulations provides that the amounts referred to as being nondeductible include amounts paid or incurred "to add to the value, or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment, * * *." And section 1.263(a)–2 of such regulations sets forth as an example of capital expenditures the cost of acquisition, construction, or erection of machinery and equipment having a useful life substantially beyond the taxable year.

for many years. Accordingly, we think it must be concluded that the expenditure in question was not an ordinary and necessary business expense, but was a capital expenditure deductible ratably over the useful life of the new press. We think this conclusion is required under both subsections (1) and (2) of section 263(a) of the Code. We think the expenditure was clearly one for permanent improvements or betterments made to increase the value of the leased property, within the meaning of subsection (1) ; it was also an amount expended in restoring property or making good the exhaustion thereof, within the meaning of subsection (2). As pointed out in the Findings of Fact, the new Goss press replaced the old Scott press, and the petitioner had previously been allowed a deduction of the cost of such old press.

We do not think the decision of the Court of Appeals in the prior case with respect to the items there held to be deductible is governing as a precedent with respect to the expenditure here involved. The prior case involved 22 miscellaneous items of machinery, equipment, furniture, and fixtures costing $13,873.05, whereas the item here purchased was a new press and related equipment having a cost of $413,477. The items there involved, although having useful lives in excess of 1 year, were relatively minor in comparison to the total leased property (the newspaper business). It may be that they did not substantially increase the value of the leased property or appreciably prolong its useful life, but merely maintained its ordinary operating efficiency.[11] In the instant case the replacement was of the major piece of equipment used in the newspaper business. As stated above, we think there can be no question that the result of this expenditure was to substantially increase the value of the leased property and appreciably extend its useful life. Such outlay does not come within the type of expenditures involved in the *Southern Railway Co.* case referred to in footnote 11. In our opinion this replacement cost cannot be considered as mere expense of maintenance of the leased property. See *Hotel Kingkade, supra.* Nor can we assume that if this particular expenditure had been involved in the prior case the Court of Appeals would have treated it in the same manner as the miscellaneous items with which it was concerned.

[11] It has been recognized that replacements of parts of a machine or item of equipment, even though such parts themselves may have a useful life of several years, need not be capitalized if they do not substantially increase the value of the machine or equipment or appreciably extend their useful lives. See *Libby & Blouin, Ltd.,* 4 B.T.A. 910 ; and *Brier Hill Collieries,* 12 B.T.A. 500, reversed on another issue (C.A. 6) 50 F. 2d 777. In *Southern Railway Co.* v. *Commissioner,* (C.A. 4) 74 F. 2d 887, affirming in part and reversing in part 27 B.T.A. 673, the view was taken that in a large business such as a railroad, in which there recur from year to year thousands of replacement or repair items which have no greater effect than to provide the normal level of maintenance and which merely counterbalance current depreciation on items of that nature, the cost of such items may be deducted as an expense, even though the useful lives of the individual items may extend beyond 1 year. The court stated that it would be inconvenient, if not impractical, in such case to charge every item having a life of more than 1 year to capital account.

The petitioner relies, among other cases, upon two cases cited by the Court of Appeals in its prior opinion, namely, *Illinois Cent. R. Co.* v. *Commissioner*, (C.A. 7) 90 F. 2d 458, reversing 34 B.T.A. 1; and *Atlantic Coast Line Railroad Co.*, 31 B.T.A. 730, affirmed on other issues (C.A. 4) 81 F. 2d 309, certiorari denied 298 U.S. 656. In the *Illinois Cent. R. Co.* case the lessee retired, over a period of 4 years, 1,464 units of leased equipment and accrued and deducted its liability for replacement thereof. It was held that the deductions were proper. However, there also the expenditures (although for substantial replacements) may not have substantially increased the value of the leased railroads or appreciably prolonged their useful lives. We do not consider the *Atlantic Coast Line Railroad Co.* case as being in point. There the petitioner made payments to the lessor *in lieu of* its obligation under the lease to replace property. Apparently the property was not replaced, and hence the payments did not result in the acquisition of any asset which would benefit the taxpayer over a period beyond the current year. In that case, therefore, the expenditures were not capital expenditures.

The petitioner states on brief that it has continuously, since the years involved in the prior case, treated the cost of replacements as ordinary and necessary business expenses and that the Commissioner has concurred in that treatment until the inception of the present case. It claims that this amounts to a method of accounting which clearly reflects its income and that the respondent's present action amounts to an unauthorized unilateral attempt to change such method. It is not necessary to here consider the right of the respondent to require a change of accounting method. Suffice it to say that whatever the method of accounting, capital expenditures, such as that involved here, are not deductible as ordinary and necessary business expenses. Even if the item here involved were similar to other expenditures for prior years which the respondent did not question as deductions, he would not be precluded from insisting upon the proper treatment of the expenditure here involved. *Hotel Kingkade* v. *Commissioner, supra.*

In view of our holding that the petitioner is not entitled to deduct the expenditures in question for the taxable year ended October 31, 1957, there will be no net operating loss for that year to be carried back to the taxable year ended October 31, 1955.

*Decision will be entered for the respondent.*