## WRIGHT et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 3139.

Circuit Court of Appeals, Fourth Circuit.

June 17, 1931.

A. C. Todd, of Greenwood, S. C. (Park, McDonald & Todd, of Greenwood, S. C., on the brief), for petitioners.

Wm. Cutler Thompson, Sp. Asst. to Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., Sewall Key and J. P. Jackson, Sp. Assts. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and J. K. Polk, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

NORTHCOTT, Circuit Judge.

This is a petition to review a decision of the United States Board of Tax Appeals, which decision is reported in 19 B. T. A. 541. The Banna Manufacturing Company was a corporation organized under the laws of South Carolina engaged in operating a cotton mill at Goldville in that state. In the years 1919 and 1920 its outstanding capital stock was $248,300 divided into 2,483 shares of the par value of $100 each, and consisted of three classes of stock as follows: 1,000 shares of common stock ($100,000); 967 shares of guaranteed stock ($96,700); and 516 shares of preferred stock ($51,600). In the latter part of the year 1919 a written contract was executed by and between all the holders of the common stock of the Banna Manufacturing Company as sellers, and one S. H. McGhee as buyer, for the sale of the common stock. The agreement provided, among other things, that the sellers agreed to sell and the buyer agreed to buy on January 2, 1920, all of the stock of the Banna Manufacturing Company at a certain fixed price for each spindle of the said Banna Manufacturing

Company, and in addition, the buyer agreed to buy and pay for certain quick assets of the Manufacturing Company. The agreement further provided that all the stock of the Banna Manufacturing Company was to be put in the name of Banna Mills and indorsed in blank and deposited with a trust company for the benefit and security of the sellers, qualifying shares of directors excepted. The buyer agreed to pay, and did pay, for the stock $234,116 in cash, and $250,000 par value of the preferred stock of the Banna Mills. Part of the cash received was used to pay the expenses of the sale, and for the purchase of certain guaranteed and preferred stock of the Banna Manufacturing Company, which the holders of the common stock had purchased in accordance with the agreement of sale, and the remainder was distributed to the common stockholders of the Banna Manufacturing Company in payment at par for the shares of guaranteed and preferred stock held by them, and for their common stock at the rate of $70 per share. The preferred stock of the Banna Mills, which was delivered according to the agreement, was all distributed among the common stockholders of the Banna Manufacturing Company in proportion to the number of shares owned by them.

The petitioner George M. Wright received on account of the 225 shares of the common stock of the Banna Manufacturing Company owned by him the sum of $15,750 in cash and 563 shares of the preferred stock of Banna Mills. The petitioner William A. Moorehead received on account of the 100 shares of common stock of the Banna Manufacturing Company owned by him the sum of $7,000 in cash and 250 shares of the preferred stock of Banna Mills. Concurrently with the delivery of the capital stock of the Banna Manufacturing Company said stock was placed in trust by the buyers for the benefit and security of the $250,000 of preferred stock of the Banna Mills, in accord with the agreement.

The $250,000 of the preferred stock of the Banna Mills was to pay 8 per cent. cumulative dividends, and this was promptly paid until the year 1924, when the stock was redeemed at $95 per share. The trust agreement had provided that it was to run for a period of five years.

At and after January 2, 1920, the preferred stock of the Banna Mills was closely held and was not listed or dealt in on any exchange. In January or February, 1920, the Petitioner George M. Wright sold 50 shares

of said preferred stock to one J. B. Wharton, who purchased the stock as an investment at $100 per share. There were no other sales or offers for sale of said preferred stock in the year 1920. There were some other small sales of the stock in the years 1922 and 1923, at $95 per share, and a sale of 55 shares in February, 1922, at $80 per share. The contract price of the stock of the Banna Manufacturing Company, on a basis of $34 per spindle, amounted to $483,616, and the Board of Tax Appeals found that the value of the assets of the Banna Manufacturing Company in 1920 was greater than the $415,000 for which they were sold in 1924.

It is contended, on behalf of the petitioners, that by the transaction of January, 1920, they did not receive any gain or profit that was taxable, and that the transaction amounted, in effect, to a stock dividend, and that the preferred stock of the Banna Mills, received by them, represented an appreciation in value of the common stock of the Banna Manufacturing Company of the nature of a stock dividend of that company. It is also claimed on behalf of the petitioners that there was no ascertainable fair market value of the Banna Mills; that there was no substantial evidence to support the findings of the Board of Tax Appeals, and that the admitted presumption in favor of the correctness of the final determination of deficiencies by the Commissioner was overcome by the evidence.

We cannot agree with the contention that the transaction was of the nature of a stock dividend, but are of the opinion that it was more in the nature of a sale with part payment in cash, and a lien for the remainder of the purchase price. A large portion, nearly or about one-half of the agreed price, was paid by the purchaser in cash; the contract refers to the transaction as a sale, and to the purchaser as the buyer, and holders of the common stock as sellers; the entire common stock of the Banna Manufacturing Company, which represented all that was transferred by the contract in question, was deposited in trust as security for the redemption of the preferred stock in the Banna Mills, which constituted, together with the cash payment, the consideration for the transfer of the common stock in the Banna Manufacturing Company; the common stock in the Banna Manufacturing Company passed entirely out of control of its holders, and the preferred stock in the Banna Mills was issued to the Banna Manufacturing Company stockholders by the purchasers, and not to the company itself. Peabody v. Eisner, 247

U. S. 347, 38 S. Ct. 546, 62 L. Ed. 1152; Marr v. United States, 268 U. S. 536, 45 S. Ct. 575, 69 L. Ed. 1079; Cullinan v. Walker, 262 U. S. 134, 43 S. Ct. 495, 67 L. Ed. 906; Rockefeller v. United States, 257 U. S. 176, 42 S. Ct. 68, 66 L. Ed. 186; see Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570.

On this point counsel for petitioners rely on the case of Weiss v. Stearn, 265 U. S. 242, 44 S. Ct. 490, 68 L. Ed. 1001, 33 A. L. R. 520, and the decision of this court in Schoenheit v. Lucas, 44 F.(2d) 476, but these cases are easily distinguished from the instant case. In the Weiss v. Stearn Case, the court said a new corporation had, in fact, been organized to take over the assets and business of the old. Technically there was a new entity; but the corporate identity was deemed to have been substantially maintained because the new corporation was organized under the laws of the same state, with presumably the same powers as the old. There was also no change in the characters of securities issued. By reason of these facts, the proportional interest of the stockholder after the distribution of the new securities was deemed to be exactly the same as if the par value of the stock in the old corporation had been reduced, and five shares of reduced par value stock had been issued in place of every two shares of the old stock.

In the Schoenheit Case, this court held that the transaction was not taxable because the change was one of form rather than of substance, and the stockholder got nothing which he did not already have. Here there was not only technically, but in fact, a new entity. There was a change in the character of securities issued. The proportional interest of the stockholders, after the distribution of the new securities, was different from that which it was before the distribution. We cannot escape the conclusion that the transaction was, in effect, a sale, and that the petitioner received something taxable from it in the year 1920.

This court has repeatedly held, and it is not necessary to quote authorities to that effect, that the determination of the commissioner is prima facie correct, nor will the courts review the finding of the Board of Tax Appeals on questions of fact, where there is substantial evidence to support such finding. Anchor Co. v. Commissioner (C. C. A.) 42 F.(2d) 99, 100, and authorities there quoted.

As to the contention that there was no ascertainable fair market value, we again cannot agree. In Anchor Co. v. Commissioner, supra, Judge Parker of this court said:

"The fair market value of the property as of March 1, 1913, was peculiarly a question of fact for the determination of the Board. It had before it, not only the opinion evidence relied upon by the taxpayer, but also the facts as to the cost of the property, the cost of the improvements placed thereon, the rate of depreciation, and the valuation fixed by the Commissioner of Internal Revenue, the last of which was prima facie correct. Brooks v. Commissioner (C. C. A. 4th) 35 F.(2d) 178; Wickwire v. Reinecke, 275 U. S. 101, 105, 48 S. Ct. 43, 72 L. Ed. 184. What weight was to be given to these various matters in determining the value as of March 1, 1913, was for the Board to decide; and there is nothing to show that it abused its discretion or proceeded upon any erroneous view of the law."

Again in the case of Penney & Long, Inc., v. Commissioner of Internal Revenue, 39 F. (2d) 849, 851, this court said:

"The very language of the statute itself, 'to the amount of its fair market value,' presupposes the making of some estimate and the exercise of some judgment on the part of the Commissioner in finding, from all the circumstances, what a 'fair market value' may have been."

In the instant case sales were made, it is true, of a small quantity of the preferred stock in the Banna Mills at the same or a greater price than that fixed as the value of the stock by the commissioner. Certainly the intrinsic value of the security behind the stock justified the value fixed by the commissioner. The 8 per cent. dividend, which was promptly paid, would tend to prove at least the value fixed by the Commissioner, and, finally, the price, at which the stock was redeemed in 1929, was the same price as that fixed by him and found by the Board of Tax Appeals as the fair market value. Certainly there was substantial evidence to support the finding of the Board of Tax Appeals, and as above shown, in such case, we will not review that finding.

The contention on behalf of the petitioners that the taxable profit accruing to them could not be ascertained until the end of the period fixed in the trust agreement of five years is not sound. Were such an agreement held to fix the date of the taxation of profits in a transaction of this kind the government would be at the mercy of the purchaser and seller in each contract of sale, and if the tax-

ing date could be postponed for five years by such a contract between purchaser and seller, it could be postponed for twenty years. As pointed out by Mr. Justice Stone in the case of Burnet v. Sanford & Brooks Co., 282 U. S. 359, 51 S. Ct. 150, 152, 75 L. Ed. 383, "It is the essence of any system of taxation that it should produce revenue ascertainable, and payable to the government, at regular intervals. Only by such a system is it practicable to produce a regular flow of income and apply methods of accounting, assessment, and collection capable of practical operation. It is not suggested that there has ever been any general scheme for taxing income on any other basis." And the government cannot, of necessity, in the collection of its taxes, be left to the mercy of agreements between individuals.

There was nothing in the action of the board subject to review by this court, and its order is accordingly affirmed.