FIVE STAR MANUFACTURING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 77398. Filed May 21, 1963

*L. Lamar Beacham*, for the petitioner.
*Glen W. Gilson II*, for the respondent.

ATKINS, *Judge:* The respondent determined a deficiency in income tax for the taxable year ended June 30, 1957, in the amount of $18,377.89.

The issue presented is whether the petitioner is entitled to deduct for its taxable year ended June 30, 1955, the amount of $56,000, or any part thereof, credited on its books against the outstanding indebtedness of one of its two stockholders, upon its acquisition from such stockholder of 50 percent of its outstanding stock. Dependent on the decision of this issue is the amount of a net operating loss carryover to petitioner's taxable year ended June 30, 1957.

FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

The petitioner is a corporation organized under the laws of the State of Minnesota and operating in the State of Mississippi with its mailing address at Clarksdale, Miss. It filed its income tax return for the taxable year ended June 30, 1955, with the district director of internal revenue at Fargo, N. Dak., and its income tax returns for the taxable years ended June 30, 1956, and June 30, 1957, with the district director of internal revenue at Jackson, Miss. Its principal business is manufacturing and distributing automobile heaters known as the "Freeman Headbolt Heater." The petitioner's stock was owned 50 percent by W. S. Kincade and 50 percent by H. E. Smith, Jr. Kincade was its president and general manager and Smith was its vice president, and the two of them, together with their wives, constituted the petitioner's board of directors.

The Freeman headbolt heater was covered by a patent issued to Andrew L. Freeman of Grand Forks, N. Dak., on November 8, 1949. On June 28, 1950, Freeman assigned under a "patent license agreement" the sole and exclusive right, for the term of the patent or renewal thereof, to manufacture, use, and sell this heater within the United States, its territories, dependencies, and possessions, to Kincade and Smith for a consideration of $80,000 plus royalties of 5 percent of the selling price of all such heaters manufactured, sold, and collected for, and in any event, a total minimum royalty of $10,000 per year.

On the same day Kincade and Smith, as permitted by the above-described agreement, leased and let the exclusive patent license to manufacture, use, and sell the heater to the petitioner for 10 years under a "lease and option" for a consideration consisting of (a) $80,000, (b) payment to Kincade and Smith of 10 percent of the selling price of all heaters in excess of 200,000 sold by it within any annual accounting period, and (c) payment of royalties to Freeman and assumption of other obligations under the original patent license agreement.

The petitioner commenced the manufacture and distribution of the heaters during 1950 and remitted the proper royalties to Freeman until April 20, 1952. After that time Freeman received no accounting for royalties from the petitioner or from Kincade or Smith.

From an undisclosed time until early 1954 Smith withdrew from the petitioner, in the form of salaries, expenses, and moneys borrowed, in excess of $350,000, which included cost of transportation of himself and his family in traveling within the United States and to foreign countries, which he charged to the petitioner. At that time Smith owed the petitioner on promissory notes approximately $88,000.

In 1953 the petitioner borrowed $150,000 from the Bank of Clarksdale, Miss., on the personal endorsement of Kincade, since the petitioner could not borrow money in Clarksdale or in Grand Forks, N. Dak., without Kincade's personal endorsement. Of this amount the petitioner repaid the bank $100,000 and Kincade had to repay $50,000 out of his own pocket because of his endorsement. At the beginning of 1954 the petitioner owed Kincade approximately $296,000 for advances made by him to it.

In 1954 a series of lawsuits was commenced involving the petitioner and its two stockholders, with the results hereinafter described.

In April 1954 Freeman, since he had received no accounting for royalties since April 1952, brought two suits in the District Court of the United States for the District of North Dakota, Northeastern Division, against the petitioner, Kincade, and Smith, one suit to recover back royalties and the other to cancel the patent license agreement between himself and Kincade and Smith.

In connection with the suit to recover unpaid royalties due under the license agreement, Freeman filed two writs of attachment, one dated April 14, 1954, covering 90,000 Freeman headbolt heaters in a warehouse in Grand Forks, N. Dak. (which represented approximately two-thirds of the petitioner's finished-goods inventory), and the other dated April 21, 1954, covering 213 extension cords and 4 vacant lots of the petitioner.

The court in the first suit awarded Freeman a money judgment of $62,994.31, which judgment was reflected on petitioner's balance sheet as of June 30, 1954, for past royalties due. On the failure of the various defendants to appear and answer Freeman's complaint in the other suit, the court entered a judgment dated July 6, 1954, canceling the patent license agreement between Freeman and Kincade and Smith. Because Kincade paid a part of the judgment for past royalties and gave Freeman assurance of payment of the remainder, Freeman never executed on such judgment and never seized any of the inventory or other goods covered by the writs of attachment.

On July 13, 1954, Freeman entered into a new agreement with Kincade, personally,[1] for the licensing of the manufacture, use, and sale of Freeman headbolt heaters, which provided that a formal license

[1] Freeman was willing to enter into this agreement with Kincade because he, Kincade, had carried out his promise to Freeman and had paid the royalties, whereas Smith had not. He was unwilling to enter into any agreement which would involve Smith, whether with the petitioner or otherwise.

agreement should be executed containing substantially the same provisions, including the right to sublicense, as were contained in the prior license agreement. Such agreement remained in effect until May 11, 1955, when a formal license agreement was made between them.

Sometime in early 1954 the petitioner made a demand upon Smith for payment of money which he owed it. Smith failed to pay, and instead, in March 1954 he filed suit in the District Court of the United States for the Northern District of Mississippi, Delta Division, against the petitioner and Kincade to have a receiver appointed for the petitioner. Cross-complaints and counterclaims were filed; the cause was heard by the court on May 5, 1954; findings of fact, conclusions of law, and opinion were made by the court on May 12, 1954; and judgment dated May 12, 1954, was entered on all complaints. The court decreed that the petitioner should recover from Smith the sum of $88,610 on Smith's promissory notes held by the petitioner, subject to a credit of $7,500 for rentals due Smith from the petitioner. Smith was given 30 days in which to pay the judgment rendered against him, and the court appointed a special commissioner to sell Smith's stock in the petitioner for the satisfaction of such judgment unless it was paid to the petitioner on or before June 12, 1954. The judgment provided that if the petitioner should be the successful bidder at such a sale, it would have the right to apply all or part of its judgment against Smith in satisfaction of the bid. The court also entered judgment in favor of Kincade against the petitioner in the total amount of $296,723.21 and against Smith in the total amount of $16,562.60. The court dismissed, on the merits, Smith's petition for appointment of a receiver.[2] It left open Smith's and Kincade's claims for salaries from May 1953 to the date of judgment.

Smith did not pay the judgment entered against him in favor of the petitioner by the date set by the court, June 12, 1954, and sale of his stock at public auction was held on June 25, 1954. The only persons who attended this sale were representatives of the petitioner, including Kincade, and Smith's attorney, and the only bid made at the auction was made by the petitioner in the amount of $40,000. On

---

[2] In its opinion the court stated in part:

"If there were any creditors or innocent stockholders of this corporation, I would unhesitatingly put it in receivership, with orders to the receiver to proceed, in so far as possible, to make the directors disgorge for their benefit. I find no one, however, in that category. The only creditor of any consequence [Kincade] is not here complaining and seems to be well on the way toward protecting himself in litigation now pending.

\* \* \* \* \* \* \*

"The court finds that, if there is to be salvation for The Five Star Manufacturing Company, it will have to come from the use of Mr. Kincade's personal credit, his know-how in this business and his energy and business ability, and that to hamper this use by the appointment of a receiver would be absolutely fatal to the future of the corporation and could mean only liquidation, disastrous to all concerned, and, therefore, the prayer for a receivership is denied."

July 8, 1954, Smith filed a motion to deny confirmation of the sale at the aforementioned price, asserting that he had been unable to raise sufficient cash to pay the judgment and alleging that the bid was an inadequate price and that the stock was worth far in excess thereof, and moved for an order of the court for resale of the stock. In his motion Smith guaranteed a bid of $48,000 for such stock, plus all costs of resale, and filed therewith his bond in the sum of $80,000 to guarantee the bid and payment thereof. Smith's motion was granted by the court.

On July 19, 1954, the resale of Smith's stock in the petitioner was held and was attended only by representatives of the petitioner, including Kincade, and Smith's attorney. The only bid at such sale was made by the petitioner in the amount of $56,000, which bid had been approved by Kincade. Smith filed another motion for resale of the stock, but this motion was denied by the court by order dated July 26, 1954. The court also entered a judgment dated July 26, 1954, confirming the special commissioner's report of the sale; directing the special commissioner to execute an assignment to the petitioner of the shares of petitioner formerly standing in the name of Smith and his wife, authorizing the proper officer of petitioner to transfer such shares on its books, and vesting petitioner with all right, title, and interest in such shares; and ordering the sum of $56,000, less the special commissioner's fee paid by the petitioner, to be credited on the judgment against Smith. Pursuant to this judgment the special commissioner executed the assignment and transfer of such shares to the petitioner on the same date. The court's findings of fact, conclusions of law, and opinion, and the judgment entered pursuant thereto, were upheld by the U.S. Court of Appeals for the Fifth Circuit on April 18, 1956 (*Smith* v. *Kincade*, 232 F. 2d 306).

Immediately after the sale the petitioner made an entry on its books debiting "Treasury stock" $56,000 and crediting "Judgments receivable—H. E. Smith, Jr." the same amount, and a second entry debiting "Capital stock (par value)" $10,000 and "Premium paid on treasury stock" $46,000 and crediting "Treasury stock" $56,000.

The assets, liabilities, and book net worth of the petitioner as of July 19, 1954, the date of the sale, were accurately reflected by its balance sheet at June 30, 1954, as follows:

### ASSETS

Current Assets:

| | |
|---|---:|
| Petty Cash | 100.00 |
| Red River National Bank—Overdraft | (809.58) |
| Bank of Clarksdale | 11.63 |
| Accounts Receivable | 1,008.92 |
| Advance to Employees other than H. E. Smith, Jr. | 607.93 |
| Advance to H. E. Smith, Jr. | 800.00 |

| | | | |
|---|---|---:|---:|
| Coca-Cola fund | | 173.49 | |
| Raw Materials Inventory | | 81,915.09 | |
| Goods in Process Inventory | | 15,312.98 | |
| Finished Goods Inventory | | 389,212.33 | |
| Judgment Receivable—H. E. Smith, Jr | | 88,610.00 | |
| Accrued Interest Receivable | | 699.17 | |
| Total Current Assets | | | 577,641.96 |

| Fixed Assets: | Cost | Res. for Depr. | | |
|---|---:|---:|---:|---:|
| Land | 1,400.00 | | 1,400.00 | |
| Factory Mach. and Equip | 25,276.83 | 16,215.47 | 9,061.36 | |
| Leasehold Impr | 33,165.09 | 18,548.09 | 14,617.00 | |
| Office Furn. & Fix | 7,327.35 | 4,488.86 | 2,838.49 | |
| Trucks and Autos | 24,317.34 | 13,433.56 | 10,883.78 | |
| | 91,486.61 | 52,685.98 | | 38,800.63 |
| Deferred Charges: Prepaid Insurance | | | | 1,425.41 |
| Total Assets | | | | 617,868.00 |

## LIABILITIES AND CAPITAL

Current Liabilities:

| | | |
|---|---:|---:|
| Accounts Payable | 3,664.71 | |
| Accounts Payable—Delta Mfg. Co | 49,804.80 | |
| Due on Patent License | 18,684.03 | |
| Commissions Payable | 579.66 | |
| Rents Payable | 3,000.00 | |
| Notes Payable | 45,381.09 | |
| Accrued Interest Payable | 3,925.71 | |
| Social Security Tax Payable | 780.41 | |
| Withholding Tax Payable | 2,267.68 | |
| Unemployment Compensation Tax Payable | 321.47 | |
| Federal Excise Tax Payable | 56.73 | |
| Manufacturer's Excise Tax Payable | 763.53 | |
| Federal Income Tax Payable | 1,482.88 | |
| Judgments Payable—W. S. Kincade | 296,723.21 | |
| Judgments Payable—H. E. Smith, Jr | 7,500.00 | |
| Accrued Interest Payable—W. S. Kincade | 2,390.06 | |
| Accrued Interest Payable—H. E. Smith, Jr | 60.41 | |
| Salaries Payable—W. S. Kincade | 36,166.77 | |
| Salaries Payable—H. E. Smith, Jr | 25,833.33 | |
| Total Current Liabilities | | 499,386.48 |

Capital:

| | | |
|---|---:|---:|
| Capital Stock | 20,000.00 | |
| Surplus—June 30, 1953 | 266,649.03 | |
| Net Loss for the Fiscal Year | 168,167.51 | |
| Surplus—June 30, 1954 | 98,481.52 | |
| Total Capital | | 118,481.52 |
| Total Liabilities and Capital | | $617,868.00 |

As of July 19, 1954, the net amount due petitioner from Smith was $56,715.43, computed by adding to the judgment of $88,610, interest thereon of $699.17 and a travel advance of $800, and by subtracting the $7,500 judgment in Smith's favor for rentals due, interest of $60.41 on such judgment, and accrued salary due him of $25,833.33. There remained a balance of $715.43 due from Smith after the credit of $56,000 by the petitioner on account of the purchase of Smith's stock in petitioner. The petitioner subsequently charged off the balance of $715.43 as a bad debt loss and claimed it as a deduction for income tax purposes (the year of deduction is not shown) and such loss was not disallowed by the respondent.

Kincade, at an undisclosed time, attempted to collect the judgment rendered in his favor against Smith by filing suit against Smith in North Dakota, where Smith had property. Kincade prevailed in this action, but did not collect the money because Smith had transferred his property in North Dakota to his mother. Kincade did not locate any other assets belonging to Smith which would be subject to judgment.

Within 30 days after the date of sale of Smith's stock, July 19, 1954, the petitioner, through Kincade, attempted to borrow about $200,000 from the Bank of Clarksdale, but the bank refused to loan any money to the petitioner. The bank had never actually lost any money in dealings with either the petitioner or Kincade, since Kincade had always paid the petitioner's obligations when it did not. The bank did lend about $125,000 to Kincade, his wife, and his son for the benefit of the petitioner after the sale of Smith's stock.

The petitioner did not attempt to resell to any third parties the stock acquired from Smith. The petitioner was never liquidated and was never put in receivership,[3] but after its acquisition of Smith's stock continued its business of manufacturing and distributing Freeman headbolt heaters. During the fiscal year ended June 30, 1955, and subsequent fiscal years, it made sales of heaters which it had on hand at July 19, 1954. The petitioner made payments to Kincade after July 1954 to the time of the trial of the instant case, in partial satisfaction of the judgment in his favor, and each year accrued interest thereon, but it did not accrue any salary on Kincade's behalf for the taxable years ended June 30, 1955, 1956, and 1957.

The petitioner's income tax return for the taxable year ended June

[3] At some time subsequent to July 26, 1954, the petitioner filed an answer praying for the dismissal of a petition and complaint filed by Smith on June 8, 1954, in the District Court for Polk County, Minn., for the dissolution and liquidation of the petitioner and the appointment of a liquidating receiver thereof. A hearing on Smith's petition had been set for July 8, 1954, but had been continued pending the final decision of the District Court of the United States for the Northern District of Mississippi. Smith's petition in the Minnesota court was ultimately dismissed on the ground that Smith, no longer being a stockholder of the petitioner, was unable to maintain such an action against it.

30, 1953, reflected net income of $24,714.72, and its return for the taxable year ended June 30, 1954, showed a net loss of $168,167.51.

The balance sheets on petitioner's income tax returns for the taxable years ended June 30, 1955, 1956, and 1957, showed the petitioner's total net worth at those dates to be $73,061.79, $151,302.34, and $274,-945.96, respectively, of which amounts $10,200 in each case represented capital stock, and the balance represented earned surplus.

In its return for the taxable year ended June 30, 1955, the petitioner deducted under the heading "Other deductions" the amount of $46,000, with the explanation "Loss on Redemption of Capital Stock." The petitioner's return for such taxable year reflected a net loss, before any net operating loss deduction from any other year, of $50,156.17. In its return for the taxable year ended June 30, 1956, the petitioner reported taxable income, before net operating loss deduction, of $34,587.31. The petitioner reduced this amount to zero by deducting a net operating loss carryover in the aggregate amount of $106,216.37, consisting of the remaining amount of net operating loss available for carryover from the taxable year ended June 30, 1954, of $56,060.20, and the net operating loss for the taxable year ended June 30, 1955, of $50,156.17.

In its return for the taxable year ended June 30, 1957, the petitioner reported taxable income, before any net operating loss deduction, of $168,534.40. The petitioner reduced this amount to $96,905.34 by deducting the remaining net operating loss carryovers from the taxable years ended June 30, 1954 and 1955, in the aggregate sum of $71,629.06.

In the notice of deficiency the respondent reduced the amount of the allowable deduction on account of net operating loss carryover from the 2 prior years to $38,272.76, a reduction of $33,356.30. In reaching this result the respondent determined that the petitioner was not entitled to the claimed deduction of $46,000 for the taxable year ended June 30, 1955, stating as follows:

It is held that your purchase of your capital stock at auction held by order of a Federal District Court for a price of $56,000.00 did not entitle you to a deductible loss of $46,000.00, or any other amount, nor did such transaction result in an allowable bad debt deduction in the amount of $46,000.00, or in any other amount by reason of using as a part of the purchase, the amount of a net balance receivable from the seller of the stock; such cost is held not deductible under any of the provisions of the Internal Revenue Code.

On July 19, 1954, the stock of petitioner which it received from H. E. Smith, Jr., being one-half of its outstanding stock, had a fair market value of at least $56,000.

OPINION

The petitioner contends that as a result of its acquisition in the fiscal year ended June 30, 1955, of 50 percent of its outstanding stock from Smith, it is entitled to a deduction of $56,000 either as an ordi-

nary and necessary business expense under section 162 of the Internal Revenue Code of 1954, or as a bad debt under section 166 of the Code. The $56,000 is the amount credited against the indebtedness of Smith to the petitioner upon the transfer to petitioner, pursuant to the judicial sale, of its stock held by Smith.[4]

It is the petitioner's primary contention that in purchasing Smith's stock, which it contends was worthless, for a price of $56,000 it made an expenditure constituting an ordinary and necessary business expense which is deductible. In support thereof it maintains that the purchase was required as a business necessity in order to regain the right to sell its only product and continue in existence. It states that it was necessary that Smith's stock be gotten out of his hands in order to prevent liquidation of the petitioner either by Smith, or by the other stockholder, Kincade, to protect his interest. These contentions are based upon the facts that the patent license under which the petitioner had operated had been canceled by the licensor because of nonpayment of the royalties, and that such licensor was unwilling to grant a license agreement so long as Smith was involved in any way.

The respondent, on the other hand, contends that the petitioner's stock had a fair market value of at least $56,000; that no loss resulted in fact or for tax purposes; that the purchase price of the stock did not amount to an ordinary and necessary business expense; and that there was no bad debt loss since petitioner acquired its own stock, which was valuable, in payment thereof, and since, in addition, there is no showing of the year of worthlessness of Smith's debt to petitioner, if it ever was worthless.

Apparently the parties are agreed that the instant case is not affected by section 311 of the Internal Revenue Code of 1954, which provides generally that no gain or loss shall be recognized to a corporation on distributions with respect to its stock. The regulations under section 311 make it clear that that section does not apply to transactions between a corporation and a shareholder in his capacity as a debtor.[5]

---

[4] In its return for the taxable year ended June 30, 1955, the petitioner claimed a deduction of only $46,000. However, by amended petition it alleges that the full amount of $56,000 is deductible.

[5] Section 1.311–1(e) of the Income Tax Regulations provides as follows:

(1) Section 311 is limited to distributions which are made by reason of the corporation-stockholder relationship. Section 311 does not apply to transactions between a corporation and a shareholder in his capacity as debtor, creditor, employee, or vendee, where the fact that such debtor, creditor, employee, or vendee is a shareholder is incidental to the transaction. Thus, if the corporation receives its own stock as consideration upon the sale of property by it, or in satisfaction of indebtedness to it, the gain or loss resulting is to be computed in the same manner as though the payment had been made in any other property.

(2) The following examples illustrate the application of subparagraph (1) of this paragraph:

    \*        \*        \*        \*        \*        \*        \*

Example (2). Corporation C, a corporation engaged in the manufacture and sale of automobiles, sells an automobile to individual X, and receives in payment therefor shares of the stock of Corporation C. The transaction will be treated in the same manner as if an amount of cash equal to the fair market value of such stock had been received by Corporation C.

We agree with the respondent that the petitioner is not entitled to any deduction on account of the transaction in question. Smith had borrowed money from the petitioner and in early 1954 owed the petitioner about $88,000. At that time the petitioner made demand upon Smith for payment, but Smith refused to pay and instead filed a suit in the U.S. District Court, Northern District of Mississippi, against the petitioner and Kincade to have a receiver appointed for the petitioner. Cross-claims and counterclaims were filed. That court on May 12, 1954, entered a judgment against Smith and ordered that his stock be sold in satisfaction of the judgment, if he did not pay. Smith did not pay, and the petitioner bid $40,000 for the stock at the auction. Upon motion of Smith, based on the ground that the price was inadequate and that the stock was worth in excess thereof, the court ordered a resale. Smith guaranteed a bid of $48,000. Upon the resale of such stock the petitioner bid $56,000 and obtained the stock. A further motion by Smith to set aside this sale was denied on July 26, 1954. Pursuant to a provision of the May 12 judgment of the court, the petitioner applied $56,000 of its judgment against Smith in satisfaction of the bid price for the stock. The decision of the District Court was affirmed in *Smith* v. *Kincade*, (C.A. 5) 232 F. 2d 306, the Court of Appeals holding that the May 12 judgment of the District Court became a final determination of the rights of the parties after such judgment, no appeal having been filed within the 30-day period. It also approved the sale of the stock as being a proper execution of the judgment which had become final.

In essence, then, there was a payment by Smith of his debt to the petitioner to the extent of the fair market value of his stock in the petitioner. It has been reiterated many times that fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or to sell, and both being informed. *O'Malley* v. *Ames*, (C.A. 8) 197 F. 2d 256, and cases cited therein.

Based upon a consideration of the whole record, we have concluded and have found as a fact that the petitioner's stock received by it from Smith had a fair market value at the time received, on July 19, 1954, of at least $56,000. In any event the petitioner, who bears the burden of proof, has not shown that the fair market value of the stock was less than $56,000. The balance sheet of the petitioner as of June 30, 1954, which the parties have agreed reflects the book net worth of the petitioner at July 19, 1954, indicates a book value for the one-half of the petitioner's stock owned by Smith of over $59,000. It is true, of course, that book value is not synonymous with fair market value. However, the petitioner has not established that the fair market value of the net assets of the petitioner was less than $56,000. Kincade's testimony was merely to the effect that the assets shown on the balance

sheet, with the exception of the finished-goods inventory, could not be sold for more than the amounts shown on the balance sheet, and possibly could be sold only for less than such values. It is contended by the petitioner that not all of the finished-goods inventory of $389,212.33 should be taken into consideration in calculating the book value, since Freeman, the licensor, had obtained a writ of attachment covering approximately two-thirds thereof for the purpose of collecting past-due royalties in the amount of about $63,000. However, Freeman never did seize any of the inventory pursuant to the writ, since Kincade paid part of the past-due royalties, and guaranteed payment of the rest. It is reasonable to conclude that this occurred prior to July 19, 1954, since on July 13, 1954, Freeman entered into a new agreement to grant a license to Kincade personally. It would seem then that the stock in question had a book or liquidating value of at least $56,000 as of July 19, 1954. In addition, we think the bid of $56,000, which the petitioner made on July 19, 1954, for the stock, and which was approved by the court, is persuasive evidence of the fair market value of Smith's stock. The court had rejected a prior bid of $40,000 made by petitioner for the stock and Smith was willing to bid, and guaranteed to bid, $48,000.

The petitioner argues that the stock could not have any value because the petitioner did not have the right to use the patent license. However, as pointed out above, prior to July 19, 1954, namely, on July 13, 1954, Kincade had obtained from Freeman a new agreement to grant a license to him personally. By that time it was assured that Smith would be eliminated as a stockholder since he had not paid the judgment against him, and his stock was required to be sold under court order. Indeed, the petitioner concedes that on July 19, 1954, the petitioner had the right to acquire Smith's stock, although the stock was not actually transferred until July 26, 1954. We think it also reasonable to conclude that as of July 19 it was assured that the petitioner would have the right to continue to manufacture and sell its product. As pointed out, Kincade, who on July 19, 1954, became the sole stockholder of the petitioner, obtained on July 13, 1954, an agreement from Freeman to grant Kincade, personally, a patent license. This agreement permitted Kincade to sublicense, and it seems clear that Kincade intended to and did, in effect at least, sublicense to the petitioner, since the evidence shows that upon the acquisition by the petitioner of Smith's stock it continued its business of manufacturing and distributing the automobile heaters. In this connection we note that Kincade testified that it was an advantage to him to have the petitioner, that he could not operate without it, and that he intended to see that it was never liquidated. It seems evident that Kincade considered that the stock of the petitioner had value. We therefore cannot accept his testimony that the stock was not salable at July 19,

1954. His reason for so stating was that the petitioner did not have the right to sell its only product; but, as pointed out above, Kincade had the right to sublicense to the petitioner, which he apparently did. It may be added that subsequent events demonstrate that the stock did, in fact, have value. According to the balance sheet attached to the petitioner's return for its taxable year ended June 30, 1957, its net worth had increased to about $275,000.

We are not satisfied that the stock would not be salable if potential buyers were advised of all the circumstances existing at July 19, 1954. The petitioner did not attempt to sell the stock. But, even if there was not a ready market for the stock in recognized market channels, it nevertheless had a "fair market value" within the contemplation of the revenue acts. As pointed out in *Whitlow* v. *Commissioner*, (C.A. 8) 82 F. 2d 569, affirming a Memorandum Opinion of this Court, fair market value is a term and a measure long used in the law as applicable to property having no actual current market place, and the revenue acts used the term in this broad sense. See also *Maxfield* v. *United States*, (C.A. 9) 152 F. 2d 593, certiorari denied 327 U.S. 794; *O'Malley* v. *Ames, supra;* and *George M. Wright*, 19 B.T.A. 541, affd. (C.A. 4) 50 F. 2d 727, certiorari denied 284 U.S. 652.

We have given due consideration to the testimony of two witnesses engaged in the investment or brokerage business, who expressed opinions as to the value of the petitioner's stock. Each of them testified that the stock had no value. Neither of them was familiar with the details of the petitioner's business or the circumstances existing at July 19, 1954. Their opinions were based upon an examination of the balance sheet of the petitioner, and upon the assumptions that two-thirds of the petitioner's inventory of about $389,000 was under attachment and that the petitioner had lost its license to manufacture and sell its only product. We cannot accept their opinion that the stock was worthless in view of the facts, as stated above, that by July 19, 1954, Kincade, who as a result of the transaction became the sole stockholder of petitioner, had made arrangements with Freeman to make payment of the past-due royalties and thereby discharge the writ of attachment, and had obtained the right to manufacture and sell the automobile heaters, which right he obviously intended to, and did in effect, transfer to the petitioner. Indeed, one of such witnesses testified that if the attached inventory were salable, his opinion would be somewhat different.

Having concluded that the stock which the petitioner received from Smith had a fair market value at least equal to the amount of the indebtedness canceled, it follows, of course, that the petitioner sustained no loss by way of bad debt upon the cancellation of $56,000 of Smith's indebtedness. None of the cases cited by the petitioner is in point here. For example, in *Raymond R. Bill & Co.*, 15 B.T.A. 320,

one of the principal cases relied upon by the petitioner, the taxpayer accepted in payment of a debt owed to it one-half thereof in cash and one-half in stock of the debtor which was worthless at the time received. We there held that the taxpayer had sustained a deductible loss to the extent of one-half of the debt. That case is distinguishable in view of our finding that the stock which petitioner received in the instant case had a fair market value at least equal to the amount of the debt satisfied.

Furthermore, we cannot conclude that the purchase by the petitioner of its stock was a purchase the cost of which constitutes an ordinary and necessary business expense. A claimed deduction is allowable only where the statute clearly makes provision therefor, and where the taxpayer shows that he comes within the statute. *New Colonial Co.* v. *Helvering*, 292 U.S. 435, and *Welch* v. *Helvering*, 290 U.S. 111. Section 162 (a) of the Internal Revenue Code of 1954 provides for the deduction of all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. The statute contemplates as ordinary and necessary business expenses the purchase price of only those items used in the business, the useful life of which does not extend beyond the current year. *Hotel Kingkade* v. *Commissioner*, (C.A. 10) 180 F. 2d 310, affirming 12 T.C. 561; and *Journal-Tribune Publishing Co.*, 38 T.C. 733, on appeal (C.A. 8). Thus, even if it be assumed that the basic purpose of the acquisition of the stock was to benefit the petitioner's business, by making it possible to regain the right to manufacture and sell the automobile heaters, the purchase price would not be a deductible current expense. Rather, it seems obvious that any benefit resulting from the purchase of the stock would extend over an indefinite number of years.

The petitioner cites, among other cases, *Tulane Hardwood Lumber Co.*, 24 T.C. 1146, in which it was held that the cost of a debenture of a plywood manufacturer bought by the taxpayer, a lumber dealer, in 1946 to insure it a source of plywood, was deductible in 1950 as a business expense or loss when the debenture became worthless. It also cites *Journal Co.* v. *United States*, (E.D. Wis.) 195 F. Supp. 434, in which the taxpayer purchased stock in a papermill in 1946 in order to secure newsprint, and it was held that the petitioner was entitled to deduct as an ordinary and necessary expense a loss upon the sale of such stock in a later year. Neither of those cases is in point, since in the instant case we are not concerned with a later sale of the stock or its becoming worthless later. Indeed, it would seem that in the instant case the petitioner canceled the stock of Smith which it purchased, as evidenced by the entry made crediting treasury stock, and the fact that on its subsequent balance sheets capital stock was re-

flected at only $10,200 instead of the amount at which it had previously been carried, namely, $20,000.

We conclude that the petitioner is not entitled to any deduction on account of the transaction in question.

*Decision will be entered for the respondent.*