GEORGE G. PROSKAUER and SUSAN PROSKAUER, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Proskauer v. Commissioner
Docket No. 10271-81.
United States Tax Court
T.C. Memo 1983-395; 1983 Tax Ct. Memo LEXIS 391; 46 T.C.M. (CCH) 679; T.C.M. (RIA) 83395; July 11, 1983. Charles R. Hembree and Kathleen Harris, for the petitioners. Genevieve K. Murtaugh, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioners' Federal income tax as follows: Year
Deficiency
1977
$22,031.68
1978
5,067.30
*393 All such amounts were placed in issue by the petition herein and, in addition, petitioners claimed an overpayment of tax for the year 1977 in the amount of $6,600. After concessions, the issues which we must decide are: (1) Whether expenses incurred in connection with a house owned by Buck Pond Farm, Inc., an electing small business corporation, in the years 1977 and 1978 were deductible as ordinary business expenses by the corporation; and (2) whether expenditures in 1977 and 1978 by Buck Pond Farm, Inc. to redeem some of its shares from a shareholder, and legal expenses in 1977 in connection therewith, were deductible by the corporation as ordinary and necessary expenses, such claimed deductions affecting the net corporate losses in each year, all or a portion of which were reported in petitioners' joint returns as shareholders of said corporation. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, George G. Proskauer and Susan Proskauer, husband and wife (hereinafter "George" and "Susan"), were residents of Versailles, Kentucky, at the time the petition herein was filed. For the calendar years 1977 and 1978, they *394 filed joint Federal income tax returns with the Internal Revenue Service Center at Memphis, Tennessee. George is a medical doctor, and practiced privately for a number of years in various locations, specializing in the field of pathology. In more recent years, terminating in the year 1977, he operated pathological laboratories in Akron and Cuyahoga Falls, Ohio, through a corporation known as George G. Proskauer, Inc., in which he and Susan were the sole shareholders. Susan, who was a businesswoman in her own right, developed an interest in horses and horsebreeding in the late 1940's. During the early 1950's she purchased her first yearling and, starting with this base, she bought and sold horses over the years, improving and upgrading her holdings until during the early 1970's, working in conjunction with George G. Proskauer, Inc., an investment of about $800,000 in thoroughbred horses had been built up, owned in part by George G. Proskauer, Inc. and in part by Susan. In the year 1973, Susan, together with Victor and Lucille Heerman, formed Buck Pond Farm, Inc. (hereinafter "Buck Pond" or "the corporation"), a Delaware corporation. From its formation until September 17, 1976, Susan *395 owned 500 shares of the corporation's stock, and Victor and Lucille Heerman jointly owned 500 shares, representing the total outstanding stock of Buck Pond. During this same period, Susan and Victor Heerman were officers and directors of the corporation. For its fiscal years ending June 30, 1977, and June 30, 1978, Buck Pond was an electing small business corporation under the provisions of section 1371, et seq., of the Internal Revenue Code. [1]
Since the time of its formation, Buck Pond has operated a thoroughbred horse farm in Woodford County, Kentucky. Its activities, and the sources of its income in the years before us, included boarding horses, stud fees, tobacco sales and the sales of yearlings and broodmares. Buck Pond also acted as syndicate manager for the stallion Blood Royal; supplied customers or found buyers for any syndicate members desiring to sell their Blood Roval season; and acted as agent for others in the purchase and sales of thoroughbreds, *396 receiving commissions from such transactions. Buck Pond Farm, in addition to fields and pastures, had barns, stables, foaling facilities and a paddock for the horses. The corporation maintained on the premises eight houses for the use of farm workers and their families, and paid all expenses in connection with such houses. There was a separate building used as corporate offices, in which the corporation's financial records were kept, as well as records of individual horses who were or had been on the farm. A separate guest house for visitors was also maintained. There was, in addition, a house (hereinafter the "main house") consisting of approximately nine rooms and a basement, originally built in the late 18th Century by the father of the late Chief Justice of the United States John Marshall. The main house included, inter alia, four bedrooms, a living room, dining room and den. From the inception of the corporation until the fall of 1976, Mr. and Mrs. Heerman lived in the main house, and were the active managers-in-residence of the Buck Pond operations, in general charge of all matters. Beginning at least as early as 1975, and continuing until the fall of 1976, increasing *397 disagreements and differences developed between Susan and Mr. Heerman with regard to the development and operation of Buck Pond Farm. Although apparently making occasional visits there, Susan was not in residence at Buck Pond, but was living with George in Ohio. Relations between Susan and the Heermans deteriorated to the point where Susan determined that the stockholder relationship between them had to be terminated in one way or another. She felt that the Heermans were spending more money than the corporation could afford, and she was alarmed by the corporation's condition and the financial prospects. She accordingly undertook to invoke the provisions of a buy-sell agreement which she and the Heermans had entered into in 1974, and sought to buy out the Heermans' stock, so that she could get rid of the Heermans and take over the management of Buck Pond herself. For undisclosed reasons, the Heermans refused to sell their stock to Susan under the buy-sell agreement, and Susan's attempts along this line were abandoned, although the agreement provided the remedy of specific performance against a defaulting party. Instead, under date of September 17, 1976, a tripartite agreement *398 was entered into between Susan, the Heermans, and Buck Pond, under which, inter alia: a. Buck Pond discharged its indebtedness of $328,646 to the Heermans by the payment of $65,729.25 in cash plus four installment promissory notes, each in the same amount and payable annually over a period of four years, with interest at 6%. b. Buck Pond redeemed all of the Heermans' stock at a total price of $46,354, with $9,270.75 being paid in cash at the time of the execution of the contract, and with the balance payable in four equal annual installments of equivalent amount, represented by promissory notes bearing 6% interest. c. The payment of such promissory notes issued by Buck Pond was guaranteed by Susan personally. d. The Heermans resigned as officers and directors of Buck Pond. e. The Heermans agreed to vacate the main house by November 1, 1976. f. The prior buy-sell agreement between Susan and the Heermans was formally voided. So far as the record shows, this agreement was carried out according to its terms: the Heermans severed all connection with Buck Pond, vacated the main house, and the stipulated annual payments by Buck Pond to the Heermans with respect to *399 their stock were made by Buck Pond in its fiscal years 1977 and 1978, each in the amount of $9,270.75. After the surrender of the Heermans' stock to Buck Pond, Susan remained the sole shareholder of the corporation. In negotiating and preparing the above agreement, Buck Pond incurred and paid legal fees of $10,225 in its fiscal year 1977. In March, 1977, petitioners moved into the main house at Buck Pond Farm. A few months thereafter, in June, 1977, George G. Proskauer, Inc. was merged into Buck Pond. Susan and George each surrendered their stock in George G. Proskauer, Inc. and received stock of Buck Pond under the terms of the merger agreement, and they were thereafter the sole shareholders of the corporation. [2]
After taking up residence at the main house at Buck Pond Farm, Susan and George became the active overall *400 managers of the Buck Pond operation. They had a farm manager who looked after the barns, the fields, the pastures and gave day-to-day attention to the horses. Susan and George concentrated on attracting clients and building the farm into a profitable operation. In this, their labors were both joint and several: a. George, as a physician, attended to the health of the horses, sometimes alone and sometimes in consultation with a veterinarian. He attended foalings, and examined the afterbirth for evidence of medical problems. He performed microscopic examinations of sperm at each breeding of a stallion to check fertility. b.Susan, as a student of pedigrees and blood lines, maintained extensive records in this area, including all breedings and foalings taking place at Buck Pond Farm. She consulted with customers and prospective customers in connection with breeding; boarding, buying and selling horses at Buck Pond. c. George and Susan together met with customers and prospective customers who came to the farm, and ran the financial aspects of the corporation's business. In this connection, they entertained frequently at the main house, serving luncheons, dinners, and putting *401 up customers and prospective customers overnight. The main house contained four bedrooms, of which George and Susan used two and used the other two for guest rooms. [3] Other than their own bedrooms, George and Susan used all parts of the house -- living rooms, dining room, den, and kitchen -- for both personal and business purposes. [4] They made themselves available at short notice to receive, entertain and consult with customers and prospective customers in this fashion. They also entertained friends who were not customers or prospective customers. They worked hard to make Buck Pond a profitable operation, and, after March, 1977, devoted full time to the corporate business. So far as this record shows, the main house at Buck Pond Farm was their full-time residence after March, 1977. Buck Pond reported net losses in its Form 1120S tax returns for its fiscal years ending June 30, 1977, and June 30, 1978. Petitioners, in turn, claimed a portion of the corporation's net loss in their calendar *402 year returns for 1977 and 1978, respectively, based upon their stock ownership in the corporation for each year. Upon audit of the corporation's returns, respondent disallowed expenses claimed by the corporation for depreciation, utilities, gas and fuel and insurance attributable to the main house, in the amounts of $10,591 for fiscal year 1977 and $11,969 for fiscal year 1978. Respondent also disallowed as a deduction the legal fees of $10,225 incurred by the corporation in connection with its redemption of the Heermans' stock. As the result of these and other adjustments not in issue herein, the net operating losses of the corporation were reduced, and respondent therefore made appropriate reductions in the losses claimed by petitioners in their individual returns for 1977 and 1978. Respondent's statutory notice of deficiencies to petitioners followed. In their petition herein, as amended, petitioners placed the above actions of respondent in issue and, in addition, claimed additional corporate deductions for 1977 and 1978 in the amount of $9,270.75 in each year, on account of the payments made by Buck Pond to the Heermans in those years in redemption of the Heermans' stock.
*403 For all or part of each of the corporations' fiscal years 1977 and 1978, the main house at Buck Pond Farm was used as a residence by shareholders of the corporation. The payments made by the corporation in its fiscal years 1977 and 1978 to the Heermans in redemption of their stock of the corporation, and the legal expenses incurred by the corporation in connection therewith in the year 1977, were expenses incurred by the corporation in connection with the acquisition of a capital asset. OPINION The issues which we must decide in the instant case all involve claimed ordinary income deductions (under section 162(a)) by Buck Pond Farm, Inc., an electing small business corporation within the meaning of section 1371 for its fiscal years ending June 30, 1977, and June 30, 1978. [5] The corporations' net losses for these two years were claimed by petitioners in their joint individual income tax returns for calendar years 1977 and 1978 in accordance with the provisions of section 1374. The parties are in agreement as to the propriety of such treatment; the dispute is as to the allowability of the claimed deductions in arriving at the net losses of the corporation for the two years *404 in issue. 1. Expenses Of The Main House.
In its return, the corporation claimed deductions on account of depreciation, utilities, insurance, and gas and fuel in each year with respect to the main house, which concededly was a corporate asset. Respondent disallowed the claimed deductions on the ground that they were barred by the specific provisions of section 280A, having determined that the house was used as a residence in the period in question by shareholders of an electing small business corporation. Petitioners contend that section 280A has no application to the facts of the present case. Alternatively, petitioners contend that even if section 280A applies in the present situation, the corporation is still entitled to the claimed deductions by reason of the provisions of section 280A(c)(1). The relevant portions of section 280A are reproduced in the footnote. [6]
*405 In enacting section 280A as part of Pub. L. 94-455, 90 Stat. 1569-1572. Congress intended to eliminate the imprecise and subjective "appropriate and helpful" standard which had been employed in certain previous court decisions, see Bodzin v. Commissioner,60 T.C. 820 (1973), revd. 509 F.2d 679 (4th Cir. 1975), cert. denied 423 U.S. 825, (1975), since Congress perceived a * * * need for definitive rules to resolve the conflict that exists between several recent Court decisions and the position of the Internal Revenue Service as to the correct standard governing the deductibility of expenses attributable to the maintenance of an office in the taxpayer's personal residence. [S. Rept. No. 94-938, pp. 49, 185-186, 1976-3 C.B. (Vol. 3); H. Rept. No. 94-658, pp. 695, 852-853, 1976-3 C.B. (Vol. 2); Joint Committee Expanation, pp. 1, 151-153, 1976-3 C.B. (Vol. 2).] On its face, the facts in the instant case appear to bring it clearly within the ambit of section 280A. There can be no question that the main house, owned by the corporation, was a "dwelling unit." It is also undisputed in this record that the Heermans, up to November, 1976, *406 and petitioners, after March, 1977, used the main house as their residence, and did so at a time when they were shareholders of the corporation, which was an electing small business corporation. Petitioners seek to avoid the impact of section 280A by contending that since the entire house was used by the corporation for business purposes, viz., conferring with and entertaining clients, the entire house should be considered as a working business asset of the corporation, and the personal use of the house as the shareholders' residence should be ignored. Thus, petitioners appear to contend that although section 280A may apply to an office in a home, it does not apply to a home in an office. Essentially the same argument was advanced by the taxpayer in Baie v. Commissioner,74 T.C. 105 (1980), where we said "we find this argument ingenious and appealing, but, unfortunately, insufficient to overcome the unambiguous mandate of the statute." Baie v. Commissioner,supra, at 110. Even if the entire main house were used for business purposes, the application of section 280A cannot be narrowed as petitioners urge; quite aside from the requirements *407 of section 280A(c), next discussed, the plain language of section 280A(a) will not permit it. In any case, petitioners have not shown that the entire main house was used for business purposes; we doubt, for instance, that petitioners' own bedrooms were used for business purposes, and there is no proof in this record that no personal effects, as opposed to business records, were stored in the basement.We accordingly hold that section 280A applies in the present situation. Alternatively, petitioners urge that even if section 280A is applicable here, the exceptions provided in section 280A(c)(1)(A) and (B) would permit the corporation to take the present claimed deductions. Here again, we must disagree with petitioners. We have no doubt on this record that the main house made an important contribution to the conduct of the corporation's business. It enabled the petitioners to be right on the spot and immediately available to meet, confer with and entertain customers and prospective customers of Buck Pond. It was a gracious place, and it provided an excellent setting for the cultivation of the clients who provided the corporation's income from horse breeding and maintenance. *408 We have no doubt that petitioners exploited it to the fullest. It is not clear to us, however, that the main house could be considered the "principal place of business" for the corporation, as is required by section 280A(c)(1)(A), inasmuch as Buck Pond maintained a separate building which was its business office, and in which were housed all its business records and files of horses who were or had been maintained at the Farm. [7] What is clear is that the main house, which also served as the Heermans and Petitioners' residence, was not used "exclusively" for the purposes outlined in those two subsections. The business use of the main house was undoubtedly extensive, but it was so inextricably intertwined with its personal use by the corporation's shareholders as a residence that we cannot find that any portion of the main house was used exclusively for the enumerated business purposes, as section 280A(c)(1) requires.[8]
*409 On this issue, therefore, we hold for the respondent. 2. Expenses In Connection With Acquiring the Corporation's Stock.
After a long-simmering dispute, Susan apparently determined that Mr. Heerman's management of Buck Pond was unsatisfactory, that she could no longer work with him as a co-shareholder, and that something had to be done to get him out of the corporation as an officer and shareholder. She first attempted to exercise her rights under an existing buy-sell agreement with the Heermans and purchase their stock. When this proposal was refused, an alternative arrangement was evolved, whereunder the corporation arranged to pay off its existing indebtedness to the Heermans and purchase their stock, with payments being made on the installment basis. Petitioners contend that the installment payments for the Heermans' stock which were made in 1977 and 1978, together with the legal expense incurred by the corporation in 1977 in negotiating and preparing the settlement agreement, should be deductible as ordinary and necessary expenses of the corporation under section 162(a), in that such payments were necessary to assure the corporation's continued existence.
Respondent, *410 on the other hand, has taken the more traditional position that no deductions are allowable with respect to such payments, since they were made in connection with the acquisition of a capital asset by the corporation, viz., the repurchase of its own stock. Normally, the purchase of stock, including the purchase of the issuing corporation's own stock, is to be considered a capital transaction, section 263, for which no deduction would be allowable under sectioin 162(a), Harder Services, Inc. v. Commissioner,67 T.C. 585 (1976), affd. without opinion 573 F.2d 1290 (2d Cir. 1977); See United States v. Hilton Hotels Corp.,397 U.S. 580 (1970), and the same treatment is to be given any incidental expenses connected with such purchase, such as legal fees, Woodward v. Commissioner,397 U.S. 572 (1970); Third National Bank in Nashville v. United States,427 F.2d 343 (6th Cir. 1970). Petitioners contend, however, that an exception to the general rule exists where the acquisition of the corporation's stock is made necessary in order to assure the corporation's continued existence, citing *411 Five Star Manufacturing Company v. Commissioner,355 F.2d 724 (5th Cir. 1966), revg. 40 T.C. 379 (1963). In that case, the taxpayer corporation, whose central income-producing asset was its license to manufacture and sell an article under a patent held by a third party, found itself in a situation where the patent holder had cancelled the license to the taxpayer, and had attached, through court proceedings, two-thirds of its inventory of finished goods. The corporation had no working capital and no credit. The patent holder would consent to renew the license and release his hold on the corporate assets only if one of the two shareholders was eliminated from any interest in the corporation. This was accomplished; the taxpayer corporation bought in the shareholder's stock, (apparently with infusions of money from the other shareholder) the stranglehold which the patent holder had on the corporation was released, and it survived and continued in business. Under these circumstances, the Court of Appeals for the Fifth Circuit concluded that the corporation's expenditures in buying the stock of the shareholder should be considered as ordinary and necessary *412 and deductible under section 162(a), since without such purchase the corporation would promptly have been put out of business. The Five Star case, however, was decided in 1966, under the factual "primary purpose" test which, at the time, was in frequent, if somewhat haphazard, use by the courts in deciding whether an expenditure was to be considered capital in nature or an ordinary and necessary expense. In Woodward v. Commissioner,supra, the Supreme Court, acknowledging the confused state of the law in this area, see Woodward,397 U.S. at 576, rejected the "primary purpose" test, and substituted therefor a standard which looks to the fundamental nature of the transaction, rather than the reasons for entering into it, as being determinative of the tax treatment to be afforded. The "primary purpose" test no longer correctly applies the law. Anchor Coupling Company v. United States,427 F.2d 429, 431 (7th Cir. 1970). Recognizing the important change in the law wrought by the Supreme Court in 1970 in *413 Woodward v. Commissioner,supra, the Fifth Circuit, author of the opinion in Five Star, has limited that case to its own facts and to those extraordinary situations where, as in Five Star, the purchasing corporation was faced with extinction, absent the purchase in question. Jim Walter Corp. v. United States,498 F.2d 631, 639 (5th Cir. 1974); Markham & Brown, Inc. v. United States,648 F.2d 1043 (5th Cir. 1981). The Court of Appeals for the Third Circuit has taken the same restrictive approach. H.&G. Industries, Inc. v. Commissioner,495 F.2d 653 (3d Cir. 1974), affg. 60 T.C. 163 (1973). This Court has followed the rationale of Jim Walter,Markham & Brown and H.&G. Industries. In Harder Services, Inc. v. Commissioner,supra, the taxpayer corporation repurchased an employee's stock as part of terminating his employment, all of which was done in order to extricate the taxpayer from an unfavorable financial and management situation. The taxpayer, relying on the Five Star case, claimed the right to an ordinary deduction under section 162(a) with respect to the amounts *414 paid to redeem its stock. This Court, in line with the above cases, refused to extend the attenuated authority of the Five Star case beyond the extreme situation where corporate survival was at stake, and held that the expenditure was capital in nature. In our opinion, the present case falls within the rationale of Harder Services and requires the same conclusion. The petitioners here have not convinced us that the corporate survival of Buck Pond was at stake, and that, but for the corporation's purchase of the Heermans' stock, the corporation would have gone out of existence. Granted that there was dissension here between the shareholders as to the financial policies to be pursued in developing Buck Pond Farm, we do not think that the present record establishes that the corporation was in extremis in September of 1976 and that the corporation's continued existence could be assured only by buying out the Heermans' stock. We note, for example, that in the buy-out agreement which was finally negotiated and carried out, the corporation undertook to pay substantial sums of money to the Heermans, and apparently did so, thus indicating that the corporation still had considerable *415 financial strength. What would have happened had Mr. Heerman remained in control at Buck Pond can only be a matter of speculation. Further, no explanation is offered by petitioners as to why Susan did not pursue her rights in 1976 under the existing buy-sell agreement between herself and the Heermans. That agreement by its terms provided for enforcement by specific performance in the existing circumstances, and would have enabled Susan to accomplish the desired result of getting rid of the Heermans as shareholders, without involving the corporation at all, and at no cost to it, at least so far as the purchase price of the stock was concerned. We accordingly conclude that, whatever life may be left in the narrow exception to the general rule for which the Five Star case stands, petitioners have failed to bring themselves within it. Harder Services, Inc. v. Commissioner,supra; see Atzingen-Whitehouse Dairy, Inc. v. Commissioner,36 T.C. 173 (1961), and cf. MFA Central Cooperative v. Bookwalter,427 F.2d 1341 (8th Cir. 1970), cert. denied *416 405 U.S. 1045 (1972). Further, and in addition to the general rule that the cost of acquiring capital assets, including attendant expenses, is not deductible as ordinary and necessary expense under section 162(a), we note, as we did in Harder Services, Inc. v. Commissioner,supra, that the instant transaction comes squarely within the terms of section 311(a), which denies recognition of any gain or loss to a corporation for expenditures in connection with acquiring its own stock. [9]Harder Services, Inc. v. Commissioner,supra;White Star Drive-In Laundry & Cleaners v. United States, an unreported case ( N.D.Ill. 1972, 30 A.F.T.R.2d 72-5610, 72-2U.S.T.C. par. 9683). We accordingly sustain respondent on this issue. Decision will be entered for respondent.
Footnotes
1. All references to statutes herein are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. The record indicates that among the assets transferred to Buck Pond in the merger was the fractional interest of George G. Proskauer, Inc. in certain horses owned jointly with Susan. The record does not disclose whether, or on what terms, Susan transferred to Buck Pond her interest in such horses. The horses were kept and maintained at Buck Pond Farm.↩
3. The separate guest house was also available. ↩
4. Conferences with customers were held in the living room, dining room and den, where a library of pedigree records was maintained.↩
5. This case is unaffected by the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, which in general is effective with respect to taxable years beginning after December 31, 1982.↩
6. In relevant part, section 280A reads as follows:
(a) General Rule.--Except as otherwise provided in this section, in the case of a taxpayer who is an individual or an electing small business corporation, no deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence. (c) Exceptions for Certain Business or Rental Use; Limitation on Deductions for Such Use.-- (1) Certain Business Use.--Subsection (a) shall not apply to any item to the extent such item is allocable to a portion of the dwelling unit which is exclusively used on a regular basis -- (A) as the principal place of business for any trade or business of the taxpayer, (B) as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business, or In the case of an employee, the preceding sentence shall apply only if the exclusive use referred to in the preceding sentence is for the convenience of his employer. (d) Use as Residence.-- (1) In General.--For purposes of this section, a taxpayer uses a dwelling unit during the taxable year as a residence if he uses such unit (or portion thereof) for personal purposes for a number of days which exceeds the greater of -- (A) 14 days, or (2) Personal Use of Unit.--For purposes of this section, the taxpayer shall be deemed to have used a dwelling unit for personal purposes for a day if, for any part of such day, the unit is used -- (A) for personal purposes by the taxpayer or any other person who has an interest in such unit, or by any member of the family * * * of the taxpayer or such other person; (f) Definitions and Special Rules.-- (1) Dwelling Unit Defined.--For purposes of this section -- (A) In general.--The term "dwelling unit" includes a house, apartment, condominium, mobile home, boat, or similar property, and all structures or other property appurtenant to such dwelling unit. (2) Personal Use By Electing Small Business Corporation.--In the case of an electing small business corporation, subparagraphs (A) and (B) of subsection (d)(2) shall be applied by substituting "any shareholder of the electing small business corporation" for "the taxpayer" each place it appears.↩
7. Respondent did not disallow any claimed expenses with respect to this office. ↩
8. Consistent with their position that the entire main house should be considered as devoted exclusively to business use, petitioners herein have made no attempt to allocate any portion of the main house expenses to specific areas which were claimed to be used exclusively for business purposes. Cf. Gomez v. Commissioner,T.C. Memo. 1980-565; Barnes v. Commissioner,T.C. Memo. 1982-439↩.
9. Section 311(a) reads as follows: (a) General Rule.--Except as provided in subsections (b), (c) and (d) of this section and section 453(d) [not relevant here], no gain or loss shall be recognized to a corporation on the distribution, with respect to its stock, of -- (1) its stock (or rights to acquire its stock), or (2) property.↩